## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KYLE DAVIS, STEPHANIE THORNTON, ROBERTO HERNANDEZ, KIMBERLY EAGER, MIKAELYN MCDOWELL, HOLLY HICKMAN, AMBER PORTUGAL MICHAEL SANCHEZ, and ARTEAL JORDAN,

Plaintiffs,

v.

FCA US LLC, a Delaware limited liability corporation,

Defendant.

Case No.

**DEMAND FOR JURY TRIAL**

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   JURISDICTION AND VENUE.............................................................3

III.  THE PARTIES .......................................................................................4

    A.    Plaintiffs ......................................................................................4

        1.    Plaintiff Kyle Davis ...........................................................4

        2.    Plaintiff Stephanie Thornton......................................7

        3.    Plaintiff Roberto Hernandez .......................................9

        4.    Plaintiff Kimberly Eager...........................................12

        5.    Plaintiff Mikaelyn McDowell.................................14

        6.    Plaintiff Holly Hickman............................................16

        7.    Plaintiffs Amber Portugal and Michael Sanchez.....................19

        8.    Plaintiff Arteal Jordan...............................................22

    B.    Defendant ..................................................................................25

IV.   FACTUAL ALLEGATIONS .................................................................25

    A.    FCA's 2.4L Tigershark MultiAir II Engine ........................................25

    B.    The Defects in the Class Vehicles.............................................27

        1.    The Oil Consumption defect creates a safety hazard
            for class members............................................................27

        2.    The Oil Indicator defect creates a safety hazard for
            class members. ...............................................................33

    C.    FCA's national advertising campaign misrepresents the
        safety of the Class Vehicles. ...............................................38

010902-11/1266017 V1

D.   FCA has known of the dangerous defects present in the Class Vehicles for years. ......................................................43

1.   Pre-release design, manufacturing, and testing data— as well as post-release monitoring—alerted FCA to the defects. ..................................................44

2.   Dealership repair records and warranty claims data also support FCA's knowledge of the defects. ..........................45

3.   By issuing its 2015 TSB, FCA implicitly acknowledged reports of abnormal oil consumption by 2015. ....................................................47

4.   Complaints made to NHTSA and on internet forums also support FCA's knowledge of the defects. ..........................48

5.   Acknowledgements of the pervasiveness of the defects by dealerships also supports that FCA would have known early on about them. ..............................................68

E.   FCA has exclusive knowledge of the defects. ....................................73

F.   FCA has actively concealed the defects. ............................................74

G.   The statute of limitations should be tolled. ........................................77

V.   CLASS ACTION ALLEGATIONS ................................................................78

COUNT I   VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201 *ET SEQ.*) ......................................................81

COUNT II   FRAUDULENT CONCEALMENT (BASED ON FLORIDA LAW)............................................................86

COUNT III   VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*) ......................87

COUNT IV   FRAUDULENT CONCEALMENT (BASED ON MISSOURI LAW)..........................................................92

- ii -

COUNT V  VIOLATION OF THE NEVADA DECEPTIVE TRADE
    PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*) ...................94

COUNT VI  FRAUDULENT CONCEALMENT (BASED ON
    NEVADA LAW) ........................................................................99

COUNT VII  VIOLATION OF THE NEW JERSEY CONSUMER
    FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*) ................................101

COUNT VIII  FRAUDULENT CONCEALMENT (BASED ON
    NEW JERSEY LAW) .................................................................106

COUNT IX  VIOLATIONS OF THE OHIO CONSUMER SALES
    PRACTICES ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*)...................108

COUNT X  FRAUDULENT CONCEALMENT (BASED ON OHIO
    LAW)........................................................................................114

COUNT XI  VIOLATION OF THE TENNESSEE CONSUMER
    PROTECTION ACT (TENN. CODE ANN. 47-18-101 *ET
    SEQ.*)......................................................................................116

COUNT XII  FRAUDULENT CONCEALMENT (BASED ON
    TENNESSEE LAW) .................................................................121

COUNT XIII  VIOLATION OF THE DECEPTIVE TRADE
    PRACTICES ACT – CONSUMER PROTECTION ACT
    (TEX. BUS & COM. CODE § 17.41 *ET SEQ.*)..........................................122

COUNT XIV  FRAUDULENT CONCEALMENT (BASED ON
    TEXAS LAW).............................................................................129

COUNT XI  VIOLATION OF THE VIRGINIA CONSUMER
    PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*).................130

COUNT XIV  FRAUDULENT CONCEALMENT (BASED ON
    VIRGINIA LAW)........................................................................135

COUNT XV  VIOLATIONS OF STATE CONSUMER
    PROTECTION ACTS .................................................................137

COUNT VIII  FRAUDULENT CONCEALMENT UNDER
    COMMON LAW OF EACH STATE .......................................142

RELIEF REQUESTED........................................................................143

DEMAND FOR JURY TRIAL ...........................................................144

010902-11/1266017 V1

Plaintiffs Kyle Davis, Stephanie Thornton, Roberto Hernandez, Kimberly Eager, Mikaelyn McDowell, Holly Hickman, Amber Portugal, Michael Sanchez, and Arteal Jordan bring this action on behalf of themselves and all those similarly situated who purchased or leased any vehicle equipped with a 2.4L Tigershark MultiAir II Engine (the "Class Vehicles") manufactured and sold by FCA US LLC, formerly known as Chrysler Group LLC ("FCA" or "Defendant"). All allegations made in this Complaint are based on investigation of counsel, except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## I.    INTRODUCTION

1.      Car manufacturers have a responsibility to ensure that the vehicles they sell to consumers are safe. A car manufacturer violates this duty when it sells vehicles that, unbeknownst to drivers: (a) consume excessive engine oil so that oil pressure drops too low before recommended oil changes; and (b) to avoid engine damage when oil pressure drops too low, shut off during operation without warning. This is incredibly dangerous. But this is exactly what happens with the Class Vehicles. And FCA fails to disclose it to consumers.

2.      The Class Vehicles contain a significant design and/or manufacturing defect in their engines that causes them to improperly burn off and/or consume abnormally high amounts of oil. As a result of this "Oil Consumption" defect, Class Vehicles can shut down during the course of their normal operation—placing

- 1 -

the occupants and surrounding vehicles at an increased risk of serious injury and death. Indeed, FCA has expressly acknowledged in other unrelated safety recalls that "an engine stall could cause a crash without prior warning."

3.      Moreover, the sudden shut-offs caused by the Oil Consumption defect could be avoided if FCA's oil indicator system alerted drivers of the Class Vehicles that their engine oil was running low. But it does not. And this "Oil Indicator" defect means that drivers of the Class Vehicles only become aware of a dangerously low engine-oil level after it causes an engine stall or shut-down, putting their lives at risk. Indeed, Class Vehicles shut down without warning *when FCA's oil change indicator does not yet recommend an oil change*.

4.      FCA has long known about the Oil Consumption and Oil Indicator defects, as hundreds of Class Vehicle owners and lessees have reported instances of their vehicles shutting down without warning due to low oil levels and/or pressure. Yet rather than being honest about these problems, FCA has engaged in efforts to conceal them by describing the defects as "normal" in a technical service bulletin.

5.      By characterizing the excessive oil consumption rate as "normal," FCA has avoided the economic fallout that would inevitably result from recalling the millions of Class Vehicles. As a result, Class Vehicle owners must fend for themselves, attempting to have the defect diagnosed and repaired on their own or

- 2 -

otherwise drive unsafe vehicles that could suffer from mechanical breakdown at any time, even while the car is travelling at full speed.

6.    The Oil Consumption and Oil Indicator defects pose a material safety risk to the operators and passengers of all Class Vehicles. The dangers of excessive and/or abnormal oil consumption include increased mechanical breakdown and a resulting increase in the risk of injury or death. Plaintiffs and many other class members have experienced the Oil Consumption and Oil Indicator defects, and FCA continues to put owners and lessees of the Class Vehicles at risk by refusing to replace them.

7.    The alleged defects not only threaten every passenger in a Class Vehicle, they also materially reduce the Class Vehicles' value as well. Consumers who purchased Class Vehicles have been harmed by purchases they would not have made or paid as much for had they known the truth. FCA should be required to compensate consumers for its deceptive conduct and remedy these defects. So Plaintiffs bring claims on behalf of themselves and all those similarly situated for FCA's violation of the consumer protection laws of each of the fifty states.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant; the proposed Class consists of 100 or more

- 3 -

members; and the amount in controversy exceeds $5,000,000, exclusive of costs and interest.

9.     Venue is proper in this District under 28 U.S.C. § 1391 because FCA is headquartered in this District; FCA has marketed, advertised, sold, and leased the Class Vehicles within this District; and many of the acts and transactions giving rise to this action occurred in this District, including FCA's design, manufacturing, promotion, marketing, distribution, and sale of Class Vehicles. Further, a significant number of the Class Vehicles are registered in this District and thousands of Class Vehicles are in operation in this District.

## III.   THE PARTIES

### A.     Plaintiffs

#### 1.     Plaintiff Kyle Davis

10.    Plaintiff Kyle Davis is a resident of Fort Walton Beach, Florida. On or about April 10, 2018, Plaintiff purchased a 2015 Dodge Dart, VIN No. 1C3CDFBB5FD159010 (for purposes of this section, the "Affected Vehicle") from Carvana in Fort Walton Beach, Florida. Plaintiff purchased and still owns this vehicle.

11.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling,

- 4 -

and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

12.     Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that FCA placed on the window. The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

13.     Plaintiff has followed the FCA-issued Owner's Manual for his Affected Vehicle and has performed regular oil changes. However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes. Plaintiff replaced the spark plugs for the Affected Vehicle after less than 800 miles because the Affected Vehicle kept shutting down on him. When Plaintiff checked the oil, he noticed the dipstick was completely dry and had to use three quarts of oil to fill Affected Vehicle. In November 2019, Plaintiff was driving 60 miles per hour on the freeway when the Affected Vehicle shut down on

- 5 -

him without warning. This was particularly dangerous because the other vehicles on the freeway also had no warning that the Affected Vehicle would suddenly slow down.

14.     Plaintiff delivered his vehicle to an authorized FCA dealership in Fort Walton Beach, Florida, for engine repairs and the vehicle was there for four weeks. The FCA dealership refused to provide Plaintiff with a loaner vehicle while his vehicle was being repaired. Plaintiff paid more than $4,000 to repair the Affected Vehicle's engine. Despite these repairs, the Affected Vehicle continues to consume oil at an abnormally high pace.

15.     FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because he believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had the Oil Consumption or Oil Indicator defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have

- 6 -

received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

### 2.    Plaintiff Stephanie Thornton

16.    Plaintiff Stephanie Thornton is a resident of Springfield, Missouri. On or about December 18, 2019, Plaintiff purchased a 2018 Jeep Cherokee (for purposes of this section, the "Affected Vehicle") from Corwin Chrysler Dodge Jeep Ram FIAT in Springfield, Missouri. Plaintiff purchased and still owns this vehicle.

17.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

18.    Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that FCA placed on the window. The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the

- 7 -

advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

19.     Plaintiff has followed the FCA-issued Owner's Manual for her Affected Vehicle and taken the Affected Vehicle in for regular oil changes when the indicator light has come on. However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes. Plaintiff has experienced the Oil Consumption and Oil Indicator defects over the duration of ownership. Plaintiff's Affected Vehicle has shut off on her multiple times without warning while driving. The first time this happened was within the first six months of purchase, when the Affected Vehicle had less than 5,000 miles on it. Plaintiff brought the Affected Vehicle back to the dealership she purchased it from and was told that the oil was low. Plaintiff eventually brought her Affected Vehicle to John Youngblood Motors in Ozark, Missouri, after the vehicle shut off on her when she was driving 60 miles per hour on the highway. They replaced the wiring for the shifter, PTU, and transfer case, and directed Plaintiff to return after 500 miles for oil consumption testing. Since then, Plaintiff has brought her vehicle in for oil consumption testing six times and has had to have her engine replaced.

- 8 -

20.    FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because she believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indicator defect or the fact that FCA would refuse to repair the defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

### 3.    Plaintiff Roberto Hernandez

21.    Plaintiff Roberto Hernandez is a resident of Las Vegas, Nevada. On or about April 2, 2015, Plaintiff purchased a 2015 Dodge Dart, VIN No. 1C3CDFBB0FD277711 (for purposes of this section, the "Affected Vehicle") from Chapman Las Vegas Dodge Chrysler Jeep Ram in Las Vegas, Nevada. Plaintiff purchased and still owns this vehicle.

22.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was defective and

- 9 -

did not function safely, as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

23.    Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that FCA placed on the window. The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

24.    Plaintiff has followed the FCA-issued Owner's Manual for his Affected Vehicle and taken the Affected Vehicle in for regular oil changes when the indicator light has come on. However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes. Plaintiff checks his oil once or twice a week and noticed that he was adding oil within the first 100 miles so he brought it to the dealership.

- 10 -

25.    In September 2017, Plaintiff was driving the Affected Vehicle on the highway with his family inside and the vehicle shut down without warning. This was particularly dangerous because Plaintiff was driving fast at the time and the steering wheel locked up. Plaintiff was able to get the vehicle to the side of the road and called a friend to come and tow the Affected Vehicle back to his home. In December 2018, Plaintiff was driving the Affected Vehicle home after Christmas and the vehicle shut down multiple times without warning.

26.    FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because he believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had the Oil Consumption or Oil Indicator defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

### 4.   Plaintiff Kimberly Eager

27.   Plaintiff Kimberly Eager is a resident of Waterford Works, New

Jersey. On or about February 28, 2018, Plaintiff purchased a 2018 Jeep Compass

(for purposes of this section, the "Affected Vehicle") from Cherry Hill Triplex:

Chrysler, Dodge, Jeep, Kia, Mitsubishi and Ram in Cherry Hill, New Jersey.

Plaintiff purchased and still owns this vehicle.

28.   Unknown to Plaintiff at the time the Affected Vehicle was purchased,

it was equipped with a 2.4L TigerShark Multi Air engine that was defective and

did not function safely, as advertised, or as intended by its design. FCA's unfair,

unlawful, and deceptive conduct in designing, manufacturing, marketing, selling,

and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator

defects has caused out-of-pocket loss, future attempted repairs, and diminished

value of the Affected Vehicle.

29.   Plaintiff uses the Affected Vehicle for personal, family, and/or

household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the

Monroney sticker that FCA placed on the window. The window sticker advertised

the Affected Vehicle's various features (such as price, specifications, gas mileage,

equipment and warranty details, and crash test ratings), and Plaintiff relied on the

advertisements contained within the window sticker when deciding to purchase the

- 12 -

Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

30.     Plaintiff has followed the FCA-issued Owner's Manual for her Affected Vehicle and taken the Affected Vehicle in for regular oil changes when the indicator light has come on. However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes. For example, about six months after Plaintiff purchased the Affected Vehicle, the Affected Vehicle shut down without warning while her 18-year-old daughter was driving it. Plaintiff's daughter took the vehicle to a nearby friend's house after she was able to restart it and the friend's parents checked the oil and it was four quarts low. When Plaintiff purchased the Affected Vehicle, she expected that she would change the oil every 5,000 miles, but the Affected Vehicle shut down well before 5,000 miles. Since then, Plaintiff has been checking the oil every 500 miles, which was not what she expected when she purchased the Affected Vehicle.

31.     FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because she believed FCA's broad

- 13 -

advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indicator defect or the fact that FCA would refuse to repair the defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

### 5.    Plaintiff Mikaelyn McDowell

32.    Plaintiff Mikaelyn McDowell is a resident of Columbus, Ohio. On or about January 13, 2018, Plaintiff leased a 2018 Jeep Compass, VIN No. 3C4NJDCB7JT222952 (for purposes of this section, the "Affected Vehicle") from Crown Chrysler Jeep in Dublin, Ohio. Plaintiff is still leasing this vehicle.

33.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

- 14 -

34.     Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that FCA placed on the window. The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

35.     Plaintiff has followed the FCA-issued Owner's Manual for her Affected Vehicle and taken the Affected Vehicle in for regular oil changes when the indicator light has come on. However, since leasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes. Plaintiff's Affected Vehicle has shut down on her twice while she was driving. Both times, when Plaintiff checked the dipstick in her vehicle, the oil was completely empty in it. Both times when Plaintiff brought her vehicle to Jeep Chrysler, they told her the vehicle is designed to shut off when the oil is low and that the vehicle needed an oil change. Yet both times this happened, it was well before the maintenance schedule for oil changes. The most recent time the Affected Vehicle shut down, it was 2,000 miles early for an oil change.

- 15 -

36.     FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because she believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indicator defect or the fact that FCA would refuse to repair the defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

**6.     Plaintiff Holly Hickman**

37.     Plaintiff Holly Hickman is a resident of Kodak, Tennessee. On or about September 5, 2018, Plaintiff purchased a 2018 Jeep Renegade, VIN No. ZACCJBAB6JPH72293 (for purposes of this section, the "Affected Vehicle") from Jim Cogdill Dodge Chrysler Jeep Ram in Knoxville, TN. Plaintiff purchased and still owns this vehicle.

38.     Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was defective and

- 16 -

did not function safely, as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

39.     Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that FCA placed on the window. The window sticker advertised the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

40.     Plaintiff has followed the FCA-issued Owner's Manual for her vehicle and has taken the Affected Vehicle in for regular oil changes when the indicator light has come on. However, since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects, despite adhering to FCA's suggested maintenance schedule for oil changes. Plaintiff's grandfather checked the oil only a couple of months after Plaintiff purchased the Affected Vehicle, and he added a quart of oil because the oil was low. About a month later,

- 17 -

Plaintiff checked the oil and it was low again so she added half a quart. When the oil indicator light came on, Plaintiff brought the Affected Vehicle to an FCA dealership and they added oil.

41.    After approximately 5,000 miles, Plaintiff brought the Affected Vehicle to an FCA dealership for an oil change. She mentioned to the FCA technician that she was concerned about the vehicle's oil consumption and asked them to begin oil consumption testing. The FCA dealership instructed Plaintiff to bring her vehicle in for testing every 1,000 miles. During oil consumption testing at 3,000 miles, the Affected Vehicle's oil level was low and the FCA dealership added a quart of oil. At 5,000 miles, the Affected Vehicle's oil level was showing that it was on the add oil mark but the FCA dealership did not add more oil.

42.    Plaintiff was concerned about the Affected Vehicle's oil consumption, and contacted FCA directly. Plaintiff was told that she would need to restart oil consumption testing because the FCA dealership had been doing the testing wrong. Plaintiff was then told that she would need to bring the vehicle in for testing every 500 miles.

43.    Plaintiff has contacted FCA repeatedly to discuss her concerns about the Affected Vehicle's excessive oil consumption. FCA keeps telling Plaintiff there is nothing that can be done and that she needs to keep working with the dealership.

44.     FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased her Affected Vehicle on the reasonable, but mistaken, belief that her Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because she believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indicator defect or the fact that FCA would refuse to repair the defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and she would not have purchased the Affected Vehicle or would have paid less for it.

### 7.     Plaintiffs Amber Portugal and Michael Sanchez

45.     Plaintiffs Amber Portugal and Michael Sanchez are residents of Irving, Texas. On or about May 30, 2018, Plaintiffs purchased a 2018 Jeep Compass (for purposes of this section, the "Affected Vehicle") from Covert Chrysler Jeep Dodge Ram in Austin, Texas. Plaintiffs purchased and still own this vehicle.

46.     Unknown to Plaintiffs at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was

- 19 -

defective and did not function safely, as advertised, or as intended by its design.
FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing,
marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and
Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and
diminished value of the Affected Vehicle.

47. Plaintiffs use the Affected Vehicle for personal, family, and/or
household uses. Prior to purchasing the Affected Vehicle, Plaintiffs reviewed the
Monroney sticker that FCA placed on the window. The window sticker advertised
the Affected Vehicle's various features (such as price, specifications, gas mileage,
equipment and warranty details, and crash test ratings), and Plaintiffs relied on the
advertisements contained within the window sticker when deciding to purchase the
Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle
possessed any defects.

48. Plaintiffs have followed the FCA-issued Owner's Manual for their
Affected Vehicle and taken the Affected Vehicle in for regular oil changes when
the indicator light has come on. However, since purchasing the Affected Vehicle,
Plaintiffs have experienced the Oil Consumption and Oil Indicator defects, despite
adhering to FCA's suggested maintenance schedule for oil changes. Plaintiffs'
Affected Vehicle has shut down on them multiple times without warning while
driving. When this happens, every light on the dashboard comes on and the

Affected Vehicle slows down and then stops. Plaintiffs contacted FCA and they were assigned a case manager who told them the Affected Vehicle needed a new battery and that FCA would cover the costs. Plaintiffs delivered their vehicle to an authorized FCA dealership for diagnosis and repair. The FCA technician diagnosed the vehicle with low oil and told Plaintiffs they would need to bring the Affected Vehicle back to have the oil checked at 500 miles. Additionally, Plaintiffs were told they were responsible for paying for the new battery and the dealership refused to provide Plaintiffs with a loaner vehicle for the four days the Affected Vehicle was being repaired.

49.     Even though the FCA technician added oil to the vehicle and replaced the battery, Plaintiffs' vehicle continues to consume oil at an abnormally high pace and continues to shut down on them without warning while driving.

50.     FCA never told Plaintiffs about the Oil Consumption or Oil Indicator defects, so Plaintiffs purchased their Affected Vehicle on the reasonable, but mistaken, belief that their Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiffs specifically shopped for an FCA vehicle because they believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiffs contained any disclosure that the Affected Vehicle had an Oil Consumption or Oil Indicator

defect or the fact that FCA would refuse to repair the defects. Had FCA disclosed the defects, and the fact that FCA would require Plaintiffs to pay out-of-pocket costs, including repair costs, Plaintiffs would have received these disclosures, and they would not have purchased the Affected Vehicle or would have paid less for it.

### 8.    Plaintiff Arteal Jordan

51.    Plaintiff Arteal Jordan is a resident of Chesapeake, Virginia. In March 2018, Plaintiff purchased a 2014 Dodge Dart, VIN No. 1C3CDFBB5ED723737 (for purposes of this section, the "Affected Vehicle") from Priority Chevrolet in Chesapeake, Virginia, in Chesapeake, Virginia. Plaintiff purchased and still owns this vehicle.

52.    Unknown to Plaintiff at the time the Affected Vehicle was purchased, it was equipped with a 2.4L TigerShark Multi Air engine that was defective and did not function safely, as advertised, or as intended by its design. FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Affected Vehicle with the Oil Consumption and Oil Indicator defects has caused out-of-pocket loss, future attempted repairs, and diminished value of the Affected Vehicle.

53.    Plaintiff uses the Affected Vehicle for personal, family, and/or household uses. Prior to purchasing the Affected Vehicle, Plaintiff reviewed the Monroney sticker that FCA placed on the window. The window sticker advertised

- 22 -

the Affected Vehicle's various features (such as price, specifications, gas mileage, equipment and warranty details, and crash test ratings) and Plaintiff relied on the advertisements contained within the window sticker when deciding to purchase the Affected Vehicle. The Monroney sticker did not disclose that the Affected Vehicle possessed any defects.

54.     Since purchasing the Affected Vehicle, Plaintiff has experienced the Oil Consumption and Oil Indicator defects. Plaintiff changes the oil in his 2014 Dodge Dart every 2,000–3,000 miles. Despite this relatively quick oil change rate, Plaintiff has experienced four instances where the engine stalled due to low oil levels. Plaintiff believes that this engine consumption defect results in a dangerous safety issue for himself and other drivers. After experiencing multiple engine-stalling events related to low oil levels, Plaintiff had his engine evaluated by Greenbriar Dodge in Chesapeake, Virginia. Greenbriar Dodge determined that the vehicle needed a replacement engine due to the Oil Consumption defect. So in January 2020, Greenbriar installed a used 2.4 Liter Tiger Shark replacement engine with approximately 40,000 miles in Plaintiff's vehicle. Except for the $100 deductible that Plaintiff paid, the cost of the replacement engine was covered by an extended warranty that Plaintiff previously purchased. Within a couple of months following the installation of the replacement engine, Plaintiff's vehicle again began to stall. Plaintiff returned to Greenbriar Dodge. Greenbriar Dodge told Plaintiff that

- 23 -

his engine oil was low and recommended a 1,000-mile oil consumption test and Plaintiff agreed to the test. Greenbriar replaced the Affected Vehicle's oil and instructed Plaintiff to return the Affected Vehicle after he had driven it for an additional 1,000 miles. When Plaintiff returned his vehicle to Greenbriar in May 2020 after driving it for 1,000 miles, the technician checked the oil level and determined that the vehicle consumed 1 ¼ quarts of oil during that time period. At this rate of oil consumption, Plaintiff's vehicle would have essentially no oil remaining after driving only 4,800 miles. Greenbriar recommended that Plaintiff return again after driving the vehicle for another 1,000 miles to see how much oil has been consumed. Plaintiff then contacted FCA Chrysler customer care to file a formal complaint about the oil consumption defect on May 12, 2020.

55.    FCA never told Plaintiff about the Oil Consumption or Oil Indicator defects, so Plaintiff purchased his Affected Vehicle on the reasonable, but mistaken, belief that his Affected Vehicle would be reliable and safe and would retain all of its operating characteristics throughout its useful life. Plaintiff specifically shopped for an FCA vehicle because he believed FCA's broad advertising messaging that its vehicles were safe and reliable. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had the Oil Consumption or Oil Indicator defects. Had FCA disclosed the defects, and the fact that FCA would require

- 24 -

Plaintiff to pay out-of-pocket costs, including repair costs, Plaintiff would have received these disclosures, and he would not have purchased the Affected Vehicle or would have paid less for it.

## B.    Defendant

56.    Defendant FCA US LLC is a limited liability corporation organized and in existence under the laws of the State of Delaware. FCA's corporate headquarters are located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components throughout the United States.

## IV.    FACTUAL ALLEGATIONS

## A.    FCA's 2.4L Tigershark MultiAir II Engine

57.    Prior to 2013, consumers had complained that some of the Class Vehicles were underpowered, so the larger 2.4L Tigershark MultiAir II Engine 2.4L supplanted the World Gas Engine used previously by Chrysler and was a near top-down overhaul.

- 25 -

58.     This advertisement depicts the new engine:



59.     The Class Vehicles equipped with this engine include the following:

- 2014 – 2020 Jeep Cherokee;

- 2017 – 2020 Jeep Compass;

- 2015 – 2020 Jeep Renegade;

- 2015 – 2016 Chrysler 200;

- 2013 – 2016 Dodge Dart; and

- 2016 – 2020 Fiat 500X.

60.     The 2.4L Tigershark engine employs an electro-hydraulic "MultiAir" technology proprietary to FCA. MultiAir is supposed to offer more controllable flow of air during the engine combustion cycle when compared to mechanical variable valve timing systems. According to FCA, the MultiAir technology is supposed to increase engine power and torque, reduce fuel consumption, and reduce emissions. Based on information and belief, FCA's MultiAir hydraulic system requires strict maintenance of oil volume to function properly.

**B.** **The Defects in the Class Vehicles**

**1.** **The Oil Consumption defect creates a safety hazard for class members.**

61.     Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing within the combustion chamber, and to cool the engine by carrying heat away from the moving parts. If there is insufficient engine oil, the engine will not have the necessary lubrication or cooling, causing premature wear of internal parts, inadequate performance, and catastrophic engine failure.

62.     As explained by FCA in a July 31, 2015 Technical Service Bulletin, "Engines require oil to lubricate and protect the load bearing and internal moving parts from wear including cylinder walls, pistons and piston rings."

63.     But according to FCA dealerships, there is a problem with the pistons and/or rings causing the Oil Consumption defect.

- A March 29, 2019 National Highway Traffic Safety Administration ("NHTSA") complaint regarding a 2015 Jeep Cherokee indicates that the "dealership says this is an oil consumption issue" having "to do with the pistons."

- An April 2, 2019 NHTSA complaint regarding a 2018 Jeep Compass says that the "consumer stated dealer told him [it was the] rings and pistons in the engine" and the "engine was burning a tremendous amount of oil."

- 27 -

- A November 22, 2019 NHTSA complaint regarding a 2016 Jeep Cherokee says that an "engine piston [was] blown" due to a "faulty engine with excessive oil consumption."

64.   Likewise, a January 26, 2019 NHTSA complaint regarding a 2015 Chrysler 200 says that the driver took the car to a mechanic "to figure out why the oil was running out so fast," and it "turn[ed] out the piston rings in the car are bad, [and] to fix this he said the engine would have to be taken [a]part fully and fixed."

65.   In a Technical Service Bulletin dated July 31, 2015, FCA addresses oil consumption in its vehicles but hides the precise cause of the defect. Instead of describing the cause and the fix in the bulletin, FCA instead directs the dealership "to the detailed diagnostic procedures available in DealerCONNECT> TechCONNECT."

66.   On information and belief, and based on the description of the defect in another case involving similar allegations, the top sidewall of each engine piston contains piston rings that prevent engine oil from entering the combustion chamber, as well as optimizing compression. But the oil control strategy in the Class Vehicles does not work as intended, allowing engine oil to escape past the oil control piston ring and into the combustion area. This is the result of oil control piston rings that do not integrate properly with the cylinders in which they operate. Although piston rings do not require maintenance, and are purportedly lifetime

- 28 -

parts, the rings in Class Vehicles wear down, whereby the oil control piston ring is worn flush with the piston wall, allowing engine oil to be consumed during the compression cycle.

67.     And if there is insufficient engine oil, the engine will not have the necessary lubrication or cooling, causing premature wear of internal parts and catastrophic engine failure.

68.     To avoid such catastrophic engine failure, FCA employs what it calls a "safety feature"—the Class Vehicles upon detecting low oil pressure simply shut down. As repeatedly remarked upon in NHTSA complaints regarding the Jeep Cherokee, the "dealership says it is a safety feature to shut engine off in the middle of the freeway" and "the car shutting off while in motion was referred to as a safety feature by the dealership." But consumers say it is "an unsafe safety feature and downright dangerous" and "a safety feature to save [the] engine but apparently not human lives." And one consumer called it not a "safety feature" but a "danger switch."

69.     The Oil Consumption defect unreasonably threatens the safety of drivers and passengers using the Class Vehicles. Because of the Oil Consumption defect, the Class Vehicles are prone to sudden and unexpected shut down, creating unsafe driving conditions when the vehicle stalls or shuts off without warning, as indicated in these NHTSA complaints:

- 29 -

- I PURCHASED A 2019 JEEP CHEROKEE AND IN LESS THAN 3,000 MILES THE CAR BROKE DOWN. *IT GAVE NO INDICATION, JUST COMPLETELY SHUT OFF WHILE I WAS DRIVING IN THE MIDDLE LANE OF A FAST-PACED HIGHWAY AND ALMOST KILLED ME*. THE DEALERSHIP TOLD ME IT WAS LOW ON OIL. June 12, 2019, complaint regarding 2019 Jeep Cherokee.

- VEHICLE, WHILE IN MOTION, STALLS AND ENGINE SHUTS OFF AT ANY SPEED. BEING TOLD OIL BURNS TOO QUICKLY IN THESE VEHICLES AND THIS IS A SAFETY FEATURE THE CAR HAS ALTHOUGH IT *HAS ALMOST COST ME MULTIPLE SERIOUS/POTENTILLY FATAL COLLISIONS WITH MY INFANT CHILDREN IN THE VEHICLE. NO OIL INDICATOR HAS EVER TURNED ON INDICATING OIL LEVEL IS LOW*. HAD SAME ISSUE WITH THIS CAR AT 15,000 MILES IN WHICH ENGINE WAS COMPLETELY REPLACED BUT NOW IS DOING THE SAME THING AS BEFORE. THIS IS A WELL DOCUMENTED ISSUE AMONGST JEEPS - WHY HAS THERE NOT BEEN A RECALL? *THIS IS A MAJOR SAFETY CONCERN AND OUR LIVES AND THE LIVES OF OUR CHILDREN ARE AT RISK AS I ALMOST WAS T-BONED TODAY AS MY ENGINE STALLED IN A BUSY INTERSECTION*. I WAS ATTEMPTING TO TURN BUT HAD NOT YET MANEUVERED AND WAS LEFT STALLED IN THE MIDDLE BLOCKING ONCOMING TRAFFIC ON A BUSY CITY STREET BUT HAD HAD THIS SAME PROBLEM HAPPEN ON A HIGHWAY. August 6, 2019, complaint regarding a 2016 Jeep Cherokee.

- *CAR JUST RANDOMLY SHUT OFF IN MIDDLE OF A 50 MPH HIGHWAY, ALMOST CAUSED ACCIDENT*. IT DID IT A COUPLE MORE TIMES BEFORE I GOT IT LOOKED AT. DEALER SAID IT WAS SO LOW ON OIL IT SHUT OFF. January 5, 2017, complaint regarding a 2015 Jeep Cherokee.

- THE DEALER EXPLAINED WHEN THE DIPSTICK DOES NOT "FEEL" OIL THE ENTIRE CAR ESSENTIALLY SHUTS DOWN AND LOCKS UP IN ORDER TO "PROTECT THE ENGINE" CAUSING THE DRIVER TO LOSE ALL ABILITY TO CONTROL IT. *THEY MIGHT BE PROTECTING THE ENGINE FROM*

- 30 -

***BURNING OIL, BUT TO LOSE FUNCTIONALITY PUTS MY LIFE AND FAMILY IN DANGER***. JEEP/CHRYSLER HAVE HAD THIS REPORTED BEFORE AS I FOUND NUMEROUS CASES OF THE SAME STORY. HOWEVER NO RECALL HAVE BEEN ISSUED. ***I COULD HAVE BEEN IN A VERY SERIOUS ACCIDENT. I WAS NOT TOLD ANY OF THIS INFORMATION WHEN I PURCHASED THE CAR***. May 21, 2019, complaint regarding 2016 Jeep Cherokee.

- WHEN CAR STALLS OUT IT IS WHILE YOU ARE DRIVING AND HAPPENS WITHOUT WARNING, I WAS IN THE MIDDLE OF AN INTERSECTION THE FIRST TIME IT HAPPENED TO ME. ***I COULD HAVE BEEN KILLED TO "SAVE THEIR ENGINE***." January 8, 2019, complaint regarding 2016 Jeep Cherokee.

- WHILE DRIVING THE ENGINE CUT OUT. I DRIFTED TO THE SIDE OF THE ROAD, PUT IT IN PARK AND RESTARTED IT. THERE WASN'T ANY MESSAGE THERE WAS A PROBLEM. IT WAS FINE FOR A COUPLE OF DAYS AND THEN WHILE DRIVING TO WORK THE SAME THING HAPPEN AGAIN. I WAS ABLE TO GET TO THE SIDE WITHOUT BEING HIT. ON CHECKING THE INTERNET IT SHOWED OTHERS HAD THE SAME PROBLEM AND WAS RELATED TO OIL. . CHECKED OIL AND IT WAS LOW. ***I TOOK IT TO THE DEALERSHIP AND THEY CONFIRMED THE 2.4 CUTS OFF EVEN IF THE VEHICLE IS IN MOTION WITH NO WARNING WHEN OIL IS LOW. NO ONE EVER TOLD ME THIS. HAD I BEEN ON A BUSIER MULTI LANE ROAD I MAY HAVE BEEN INVOLVED IN AN ACCIDENT***. I HAVE NEVER NEEDED TO CHECK MY OIL BETWEEN SERVICE ON A NEWER CAR BEFORE THIS IS AN UNSAFE DEFAULT TO LOW OIL. ***IT PUTS THE DRIVER AND PUBLIC IN DANGER. HAD I BEEN TOLD THE VEHICLE MAY SHUT OFF WHILE I WAS DRIVING I WOULD NEVER HAVE BOUGHT THE CAR***. I CANT BELIEVE THAT THEY ARE ALLOWED TO HAVE THIS AS A FEATURE WITH NO WARNING. April 28, 2018, complaint regarding 2016 Jeep Cherokee.

- WHILE DRIVING MY CAR, THE ENGINE SHUT OFF IN MID DRIVE, IN MOTION, IN A PARKING STRUCTURE GETTING READY TO GET ON THE FREEWAY. I COMPLAINED TO THE DEALER AND THEY SAID IT WAS BECAUSE I NEEDED AN OIL CHANGE AND I WASN'T OVER MILEAGE BY THAT MUCH, HE SAID HE HAS HEARD THIS HAPPEN BEFORE TO A CUSTOMER. ***I WAS SO TERRIFIED BECAUSE I COULD HAVE BEEN ON THE FREEWAY AND COULD HAVE GOTTEN INTO AN ACCIDENT AND INJURED AND UNTIL THIS DAY I AM VERY DISTURBED AND WORRY IF IT WILL TURN OFF WHILE DRIVING AND EVEN MORE TERRIFIED IF I AM ON THE FREEWAY!*** I JUST WANT TO REPORT THIS BECAUSE THE DEALERSHIP'S RESPONSE DIDN'T SIT WELL WITH ME AND ***I THINK IT IS VERY VERY DANGEROUS FOR THE CAR TO TURN OFF JUST BECAUSE YOU NEED AN OIL CHANGE***, IS THERE A DEFECT IN MY CAR? August 20, 2018, complaint regarding 2018 Jeep Cherokee.

- ***CAR IS BURNING OIL AND SHUTTING OFF ON THE ROAD, WHICH I OR MY CHILDREN, CAN EASILY GET HURT OR KILLED***. HAVE TRIED TO HAVE RESOLVED NUMEROUS TIMES WITH UNSATISFACTORY RESULTS FROM THE CAR LOT. AS ADVISED FROM THE SERVICE MANAGER THIS IS NORMAL UNDER CHRYSLER STANDARDS. February 23, 2018, complaint regarding 2015 Jeep Cherokee.

70. The Oil Consumption Defect also increases the expected cost of ownership and maintenance of the Class Vehicles. In order to prevent their vehicles from stalling, Plaintiffs and class members have needed to replenish the oil of their vehicles at excessive abnormal rates. Additionally, the Oil Consumption defect has the consequential effect of shortening the expected lifespan of other mechanical components of the Class Vehicles. Because of this, Plaintiffs and class members have and will be forced to replace these components at a much higher

- 32 -

rate than they reasonably expected when purchasing the vehicles, thereby increasing their overall cost of ownership.

### 2. The Oil Indicator defect creates a safety hazard for class members.

71.    The dangers of the Oil Consumption defect are worsened by the Class Vehicles' inability and/or failure to alert drivers to dangerously low oil levels and/or oil pressure.

72.    FCA has equipped the Class Vehicles with an oil change indicator system. This is a software based, algorithm-driven device that purportedly takes into account various engine operating conditions to determine when the oil needs changing, such as ambient temperature and typical trip length. It then alerts the driver of the need for an oil change. As FCA states in the Owner's Manual:

> Your vehicle is equipped with an automatic oil change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance.

> Based on engine operation conditions, the oil change indicator message will illuminate. This means that service is required for your vehicle. Operating conditions such as frequent short-trips, trailer tow, extremely hot or cold ambient temperatures will influence when the "Change Oil" or "Oil Change Required" message is displayed.

73.    FCA also explains in its Owner's Manuals that "Severe Operating Conditions can cause the change oil message to illuminate as early as 3,500 miles

- 33 -

(5,600 km) since last reset. Have your vehicle serviced as soon as possible, within the next 500 miles (805 km)."

74.     And it further explains that oil should be changed "at 4,000 miles (6,500 km) or 350 hours of engine run time if the vehicle is operated in a dusty and off road environment or is operated predominately at idle or only very low engine RPM's," as that "type of vehicle use is considered Severe Duty."

75.     Otherwise, the oil change intervals should not exceed "10,000 miles (16,000 km), twelve months or 350 hours of engine run time, whichever comes first. The 350 hours of engine run or idle time is generally only a concern for fleet customers."

76.     So a reasonable consumer driving under normal—as opposed to severe—driving conditions is instructed to change their oil either when prompted to do so by the oil change indicator or by 10,000 miles or twelve months.

77.     Remarkably, FCA's oil change indicator does *not* take into account actual, as opposed to predicted, oil levels. So it does not alert drivers of the Class Vehicles to low oil levels or oil loss, even when oil levels are critically, dangerously low. Indeed, consumers routinely report not having yet received a change oil message at the time their vehicles stalled or shut off. Put another way, the Class Vehicles regularly experience such severe shortages of oil that they automatically shut down to protect the engine *before FCA's indicator system tells*

- 34 -

*them they are due for an oil change*. This represents a complete failure of the oil

change indicator system to monitor and provide meaningful information regarding

the real world status of the Class Vehicle's oil levels.

78.     FCA also misrepresents that the Class Vehicles are equipped with a

separate Oil Pressure Warning Light designed to illuminate when "low engine oil

pressure" is detected. This messaging appears in the Owner's Manual as follows:

Oil Pressure Warning Light

| Red Telltale Light | What It Means |
|---|---|
| ⌐⌐ | **Oil Pressure Warning Light**<br>This light indicates low engine oil pressure. If the light turns on while driving, stop the vehicle and shut off the engine as soon as possible. A chime will sound when this light turns on.<br>Do not operate the vehicle until the cause is corrected. This light does not indicate how much oil is in the engine. The engine oil level must be checked under the hood. |

79.     According to FCA, a "Red Telltale Light" will illuminate and a chime

will sound to alert the driver to "stop the vehicle and shut off the engine as soon as

possible." FCA further instructs owners not to operate the vehicle until the cause is

corrected. But this system also fails to alert drivers of the Class Vehicles *in

advance* of the vehicle spontaneously shutting off as a result of low levels.

80.     As a result of the Oil Indicator defect, consumers are not warned in

time to avert sudden shut off of their vehicles, creating unsafe driving conditions,

as indicated in these NHTSA complaints:

- THE VEHICLE IS BURNING OIL BETWEEN CHANGES, IT
SHUTS OFF IN THE MIDDLE OF DRIVING ON A ROAD
BECAUSE IT HAS NO OIL. *NO WARNING MESSAGES OR
LIGHTS POP UP. I HAVE ALMOST BEEN HIT BY OTHER*

- 35 -

*CARS TWICE (WITH A CHILD IN THE BACKSEAT) BECAUSE THE CAR SHUTS DOWN AND THERE IS NO OIL IN THE CAR. MY SCREEN SAYS I HAVE OVER 50% REMAINING UNTIL THE NEXT OIL CHANGE!* I WAS DRIVING DOWN THE ROAD, AND THE VEHICLE SHUT OFF AND I WAS ALMOST HIT BY OTHER CARS! January 29, 2019, complaint regarding 2016 Jeep Cherokee.

- *THE CAR WILL SHUT DOWN WITH ABSOLUTELY NO WARNING, DOESN'T MATTER HOW FAST YOU ARE GOING. THIS HAS HAPPENED ON BOTH HIGHWAY AND BACK STREETS*. I'M TOLD BY DEALER THAT THE ISSUE IS THE OIL WAS TOO LOW AND THAT SOME SENSOR SHUTS DOWN THE ENGINE. NO WARNING LIGHT, NOTHING. JUST HAPPENS. CAN'T BELIEVE THIS FLAW HAS NOT BEEN RECALLED OR CAUSED FATALITIES. November 1, 2017, complaint regarding 2014 Jeep Cherokee.

- WHILE DRIVING, THE JEEP WILL TURN OFF AUTOMATICALLY DUE TO THE ENGINE BURING TOO MUCH OIL. IT CAUSES A SAFETY CONCERN WHEN THE CAR AUTOMATICALLY STOPS AND CAUSES OTHER CARS TO SWIRVE OR TO HIT THE CAR. *I HAVE ALMOST BEEN HIT MULTIPLE TIMES BECAUSE OF THIS. THERE IS NO WARNING TO IT AND NO OIL LIGHT TO TELL ME THE ENGINE IS LOW OF OIL*. December 31, 2019, complaint regarding 2015 Jeep Cherokee.

- MY 2015 JEEP CHEROKEE LATITUDE HAS STALL OUT 3 TIMES ON ME WHILE DRIVING ON BUSY HIGHWAYS. I TOOK THE VEHICLE IN FOR REPAIR AND WAS TOLD THIS PARTICULAR ENGINE CONSUMES OIL AT A FAST RATE AND WITHOUT ANY WARNING, WHEN LOW, WILL STALL UNEXPECTEDLY. *NO WARNING, NO OIL PRESSURE GAUGE ALERTS, CAR SIMPLE STALLS. I AM AFRAID THE VEHICLE WILL STALL AND ME AND ANY OCCUPANT WILL BE KILLED OR SERIOUSLY INJURED*. November 7, 2019, complaint regarding 2015 Jeep Cherokee.

- *WHILE DRIVING ON SUNDAY MY JEEP SUDDENLY WITHOUT NOTICE OR WARNING SHUT OFF AND WOULD*

- 36 -

> ***NOT RESTART, I WAS STRANDED IN MIDDLE OF THE ROAD*** SINCE THERE WAS NO WARNING I HAD NO TIME TO PULL TO SIDE. AAA TOWED TO CLARK CHRYSLER/JEEP WHERE IT WAS BOUGHT AND UNDER EXTENDED WARRANTY. ALL PM'S HAVE BEEN DONE THERE AND DONE TIMELY. WHAT THEY FOUND WAS JEEP WAS DOWN 3 QTS OF OIL, I ASKED HOW THAT COULD BE AND WHY WOULD ENGINE SHUT OFF SO ABRUPTLY THEY CLAIM THE 2.4 ENGINES USE 1QT PER 1,000 MILES, THAT NO INDICATOR OR WARNING COMES ON AND ENGINE WILL SHUT OFF TO PROTECT IT. NO WHERE IS IT LISTED IN OWNERS MANUAL. November 15, 2017, complaint regarding 2015 Jeep Cherokee.

- THE ENGINE BURNS THROUGH ALL OF THE OIL IN ABOUT 1500 MILES OF DRIVING. OIL HAS TO BE FILLED IN BETWEEN OIL CHANGES OR ***ENGINE WILL STOP WITH NO WARNING OR OIL LIGHT***... ENGINE STOPS WHILE MOVING. February 24, 2020, complaint regarding 2018 Jeep Cherokee.

- FIAT 500X 2016 ***TURNS OFF. NO WARNING, WHILE IN MOTION ON A CITY STREET***. MULTIPLE TIMES, LOW SPEED (20 MPH) AND HIGHER SPEED (45 MPH). DEALERSHIP TOLD ME IT WAS BECAUSE I NEEDED TO CHANGE MY OIL. January 12, 2019, NHTSA complaint regarding 2016 Fiat 500X.

- THE 2018 JEEP CHEROKEE LATITUDE CONSUMES OIL AND HAS A MECHANISM WHERE IF THE CAR IS LOW ON OIL IT WILL JUST SHUT OFF WHEN DRIVING. ***THIS IS A SERIOUS SAFETY HAZARD AS THE CAR GIVES NO WARNING IT IS LOW ON OIL. SOMEONE IS GOING TO GET KILLED ONE DAY WHEN THESE CARS JUST SHUT OFF IN THE MIDDLE OF DRIVING***. December 9, 2019, complaint regarding 2018 Jeep Cherokee.

81.    Consumers reasonably relied on FCA's representations in the Owner's Manuals regarding the oil indicator system and its ability to give notice of the need for an oil change. Those material misrepresentations are false and have

- 37 -

unreasonably placed Plaintiffs and class members at an increased risk of injury or death.

## C.   FCA's national advertising campaign misrepresents the safety of the Class Vehicles.

82.    The following are examples of Jeep Cherokee advertisements concerning the Class Vehicles that touted their safety and reliability while failing to disclose the Oil Consumption and Oil Indicator defects:







83.     These advertisements state: "Whatever the destination, the 2020

Jeep® Cherokee can help keep you and your passengers safe and secure on all your

journeys. Over 80 standard and available safety and security features work together

to help you stay protected on all your travels." They also state: "The 2020 Jeep

Grand Cherokee is always ready. Even when you're not. With over 70 Standard

and available safety and security features, plus new standard and available ProTech

Packages, the Grand Cherokee may help keep you and your loved ones out of

harm's way." And they state: "Courageous by nature. The 2020 Jeep® Cherokee

- 39 -

offers over 80 standard and available safety and security features designed to step

in and help protect you from the unexpected." But these representations are not in

fact true due to the undisclosed Oil Consumption and Oil Indication defects.

84.    The following are examples of Jeep Compass advertisements

concerning the Class Vehicles that touted their safety while failing to disclose the

Oil Consumption and Oil Indicator defects:



- 40 -





85.    These advertisements state: "Equipped with over 70 standard and

available safety and security features, the 2020 Jeep® Compass is engineered to

inspire confidence with its every innovation." And they also state: "Intuitive and

always thinking ahead. The 2020 Jeep® Compass offers innovative standard and

available safety and security technology designed to help protect you from the

- 41 -

unexpected and anticipate the things you don't." But these representations are not in fact true due to the undisclosed Oil Consumption and Oil Indication defects.

86.     The following are examples of Jeep Renegade advertisements concerning the Class Vehicles that touted their safety while failing to disclose the Oil Consumption and Oil Indicator defects:





87.    These advertisements state: "Wherever you go, over 70 standard and available safety and security technologies can go with you in the 2020 Jeep® Renegade—an ideal balance of excitement and peace of mind." And these advertisements state: While you're on the lookout for thrills and adventure, the 2020 Renegade offers over 70 standard and available safety and security features looking out for you and your crew." But these representations are not in fact true due to the undisclosed Oil Consumption and Oil Indication defects.

**D.    FCA has known of the dangerous defects present in the Class Vehicles for years.**

88.    Upon information and belief, FCA has known about the dangerous defects present in the Class Vehicles since at least 2015 and acquired such knowledge through pre-release testing; post-release monitoring; dealership repair records; warranty and post-warranty claims; complaints made to NHTSA; complaints made on internet forums; and complaints made to FCA itself. Moreover,

- 43 -

the defects themselves are pervasive, increasing the likelihood of FCA's early knowledge.

> **1.    Pre-release design, manufacturing, and testing data—as well as post-release monitoring—alerted FCA to the defects.**

89.     It is standard practice for automobile manufacturers to engage in extensive pre-launch testing of its vehicles. FCA did so here and it would have been particularly robust given the switch to the new Tigershark MultiAir II Engine. This design, engineering, and testing data is unavailable to Plaintiffs without discovery, but upon information and belief, analysis of this data would have revealed the defects. Moreover, vehicle manufacturers such as FCA have significant and dedicated departments that monitor many public and subscription sites to ensure awareness of emerging safety-related issues, among others. Emerging problems such as the Oil Consumption and Oil Indicator defects would be tracked by FCA. Relevant information would be condensed and pushed to design, development, testing, service and quality departments for follow up.

90.     FCA routinely monitors the internet for consumer complaints. Its customer relations department routinely monitors the internet for customer complaints, and it retains the services of third parties to do the same. FCA's customer relations division regularly receives and responds to customer calls concerning product defects. FCA's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships

- 44 -

and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

91.     FCA knew about the defects because its customer relations department, which interacts with FCA-authorized service technicians in order to identify potentially widespread vehicle problems and assist in diagnosing vehicle issues, has received numerous reports that the Oil Consumption and Oil Indicator defects can cause mechanical breakdown and stall a moving vehicle without any warnings from the oil indicator system.

## 2.     Dealership repair records and warranty claims data also support FCA's knowledge of the defects.

92.     Upon information and belief, FCA regularly compiles and analyzes detailed warranty service information regarding repairs performed under warranty at its network of dealerships. Indeed, FCA requires dealers to maintain detailed and meticulous records for any warranty repairs performed and routinely refuses to pay for warranty repairs made where the nature and cause of the malfunction is insufficiently described.

93.     Moreover, owners of Class Vehicles have indicated that they made complaints directly to the dealerships as well as to FCA in 2015 and early in 2016. For example:

- 45 -

- I WAS DRIVING AND ALL OF A SUDDEN THE VEHICLE ENGINE TURNED OFF. THANK GOODNESS THERE WAS NO TRAFFIC AS I WAS ONLY BLOCKS FROM THE JEEP DEALER. I WAITED APPROXIMATELY 30 SECONDS AND PUSHED THE START BUTTON AND LUCKILY THE VEHICLE STARTED BUT WOULD ONLY PUTT TO THE DEALER. THE DEALER HAD DIFFICULTY GETTING THE VEHICLE TO THE WORK STATION. WHEN THEY CALLED ME TO TELL ME THEY FIXED IT THEY TOLD ME THE REASON IT STOP WAS BECAUSE IT WAS 2 QUARTS LOW OF OIL AND THAT WAS THE CAUSE. THIS WAS VERY STRANGE AS I REMINDED THEM TO LOOK AT MY SERVICE RECORD AT WHICH I HAD THE OIL SERVICE RECENTLY DONE AT THEIR FACILITY. THEY DID NOT KNOW HOW TO RESPOND.

  ***SUBSEQUENT I CONTACTED JEEP HEADQUARTERS*** (RESOLUTION DEPT.) AND EXPLAINED WHAT HAPPENED. May 11, 2015, NHTSA complaint for Jeep Cherokee.

- WHILE DRIVING MY 2014 DODGE DART 2.4 TIGERSHARK ENGINE, THE VEHICLE SHUT OFF. THE BATTERY INDICATOR LIGHT CAME ON ALL ELECTRONICS INSIDE THE CAR WERE STILL OPERATIVE. I HAD A WRECKER TAKE THE CAR TO THE DEALERSHIP. DIAGNOSTIC TEST SHOWED LOST COMMUNICATION WITH THE BODY CONTROL MODULE. LOOKED AT OIL AND IT WAS LOW. I WAS TOLD BY AUTO TECHNICAN THAT THE AUTO SHUTS IT'S SELF OFF WHEN IT IS LOW ON OIL. THIS IS A VERY ALARMING SITUATION IF IT WOULD SHUT OFF WHILE DRIVING ON THE FREEWAY IN TRAFFIC ***I CALLED CHRYSLER AND REPORTED THIS. THE CALL CENTER STATED THAT SHE HAD 2 PEOPLE CALL THE DAY BEFORE AND 3 ON THE DAY I CALLED WITH THE EXACT PROBLEM***. SHE SAID ALL THE CARS HAD OVER 20,000 MILES ON THEM. March 19, 2016, NHTSA complaint for 2014 Dodge Dart.

- 46 -

3.     **By issuing its 2015 TSB, FCA implicitly acknowledged reports of abnormal oil consumption by 2015.**

94.     Technical Service Bulletins ("TSBs") document recommended procedures for repairing vehicles and are issued by a vehicle manufacturer when there are repeat occurrences of a reported problem.

95.     On July 31, 2015, FCA issued an "Engine Oil Consumption Guideline," TSB No. 09-007-15, to dealerships, providing guidance on what was an "acceptable rate of oil consumption" for all 2013-2016 vehicles equipped with gasoline engines, stating in relevant part:

> The accepted rate of oil consumption for engines used in the vehicles listed above is 1 quart (0.946 liter) in 2,000 miles (3,200 km) for the 1st 50,000 miles (80,467 km). For vehicles with more then [sic] 50,000 miles the acceptable oil consumption for engines is 1 quart (0.946 liter) in 750 miles (1,207 km).

96.     Of course, these guidelines are inconsistent with its oil change indicator and Owner's Manual, as discussed above, and represent FCA's attempt to "normalize" the excessive oil consumption of the Class Vehicles. But more to the point here: they demonstrate that FCA was aware in 2015 that consumers were contacting FCA and dealers with oil consumptions issues necessitating the issuance of the TSB to address them.

### 4.     Complaints made to NHTSA and on internet forums also support FCA's knowledge of the defects.

97.     In addition to the sampling of NHTSA complaints included throughout this complaint, there are hundreds of additional NHTSA complaints regarding the Oil Consumption and/or Oil Indication defects as to Jeep Cherokee alone, including dozens as to each of the 2014, 2015, 2016, 2017, 2018, and 2019 model years. The following is a sampling of NHTSA complaints from 2015 and early 2016 for Jeep Cherokee:

- ON 12/19/14 WHILE DRIVING, MY VEH *STALLED WITHOUT WARNING*. THERE WAS NO WARNING LIGHTS ILLUMINATED BEFORE, DURING/AFTER ITS FAILURE. I HAD TO HAVE THE CAR TOWED. AFTER INSPECTION, I WAS *TOLD THAT THE ENGINE OF MY NEW JEEP WAS BURNING OIL*. THE JEEP RECENTLY HAD BEEN IN FOR AN OIL CHANGE & RTD WITH THE MULTI POINT INSPECTION PAPERWORK INDICATING EVERYTHING WAS OK. HERB CHAMBERS, ALTHOUGH DIAGNOSISING THE JEEP TO BE "BURNING OIL" INSISTED, AT THE DIRECTION OF CHRYSLER PROTOCOL, THAT I DRIVE IT 5,000 MILES AND RETURN IT FOR FURTHER INSPECT. ONLY AFTER MY HUSBAND GOT INVOLVED DID THEY KEEP THE CAR, DRIVE IT, AND EVENTUALLY INSTALL A NEW ENGINE. June 15, 2015, NHTSA complaint.

- NEXT MORNING DROVE 1/4 MILE DOWN ROAD AND IT HAD *LOST ALL POWER AGAIN*. CALLED DEALERSHIP TO LET THEM KNOW I WAS BRINGING IT BACK, JEEP WOULD NOT GO PAST 3RD GEAR, ALMOST HIT MULTIPLE TIMES TRYING TO GET OFF THE ROAD. GOT TO DEALERSHIP, THEY TOLD ME IT IS UN-DRIVEABLE AFTER DRIVING OVER AN HOUR TO GET THERE, THEY HAD JEEP ALMOST 3 WEEKS. MILEAGE WAS AROUND 18,000. WOULD NEED TO REPLACE TRANSMISSION, WHEN THEY FINALLY CALLED TO SAY IT

- 48 -

WAS READY, *I WAS TOLD IT WAS BC IT NEEDED AN OIL CHANGE...WITH ONLY 3500 MILES ON THIS CHANGE*(FEB2015-MARCH2015). October 13, 2015, NHTSA complaint.

- 2 TIMES ALREADY I HAVE HAD TO TAKE MY CAR INTO THE DEALERSHIP BECAUSE IT WOULD *SHUT OFF RANDOMLY WHILE DRIVING. THIS HAS HAPPENED WHILE ON THE HIGHWAY AND ALSO WHILE ON BUSY STREETS*. SO FAR I HAVE BEEN ABLE TO DRIFT TO THE SIDE OF THE ROAD, PUT THE CAR IN PARK AND THEN TURN THE CAR OFF AND BACK ON. THE CAR SPUTTERS WHEN RESTARTING AND ON MULTIPLE OCCASIONS WILL STALL AGAIN. BOTH TIMES THEY TRIED TO BLAME IT ON THE OIL CHANGE BEING OVERDUE. THE 2ND TIME I HAD TO HAVE THE *CAR TOWED TO THE DEALERSHIP AND THEY STATED THERE WAS NO OIL IN THE CAR*. HOW A CAR LOSES OIL IF THERE ISN'T A LEAK, I'M NOT SURE. THIS IS NOW THE THIRD TIME IT IS HAPPENING AND *BASED ON THE CAR'S COMPUTER I STILL HAVE 30% TO GO BEFORE NEEDING AN OIL CHANGE* AND THE CAR IS SHUTTING OFF ON ME AGAIN RANDOMLY. I WAS AT THE DEALERSHIP FOR THE 2ND TIME LESS THAN 3 MONTHS AGO. I DRIVE IN MIAMI AND HAVE BEEN LUCKY THAT MY SON WAS NOT IN THE CAR WITH ME. November 17, 2015, NHTSA complaint.

- @3:30PM 12 /5 /15 *CHEROKEE STOP IN THE MIDDLE OF THE INTERSECTION* OF 13 MILE & UTICA. I HAD MY 7YR OLD IN THE CAR AND AVOIDED TRAFFIC ACCIDENT PULLED OVER AND IT SUDDENLY STOPPED AGAIN. FORTUNATELY WAS ABLE TO GET HOME WAS ONLY FIVE MINUTES AWAY. PLACED COMPLAINT TO CHRYSLER THEY TOWED THE VEHICLE 12/7/15. HOWEVER YESTERDAY 12/7/15 @6PM ROSEVILLE CHRYSLER JEEP DEALERSHIP SERVICE:(888)409-5930 CALLED TO TELL ME IT WAS MY ERROR THAT JEEP CHEROKEE STOP WORKING BECAUSE IT WAS "DUE AN OIL CHANGE IN OCTOBER". I TOLD REPAIR SHOP MY HUSBAND AND I NEED TO SPEAK TO A MANAGER BECAUSE 1ST I *RECEIVED NO LIGHT SIGNAL OR NOTIFICATION FROM THIS DIGITAL DISPLAY STATING I*

- 49 -

*NEEDED AN OIL CHANGE* WHICH IS PROVIDED BY 2014 JEEP CHEROKEE SECOND THERE IS NO WAY THE VEHICLE SHOULD HAVE BEEN DRY OUT OF OIL UNLESS THERE IS LEAK OR SOMETHING CAUSED OIL TO DRY UP. December 8, 2015, NHTSA complaint.

- *NEW 2015 JEEP CHEROKEE LATITUDE WITH 4K MILES ON IT SUDDENLY TURNED ITSELF OFF WHILE DRIVING DOWN THE ROAD*. NO WARNING OTHER THAN A MESSAGE ON THE DASH TO PUT THE CAR IN PARK TO CHANGE GEARS. *VERY DANGEROUS*, LOST CONTROL OF POWER STEERING, GAS AND BRAKES. WAS ABLE TO PUT CAR IN PARK ON SIDE OF ROAD, RESTART IT AND GET HOME. IT HAPPENED AGAIN THE NEXT MORNING AND WAS TOWED TO DEALERSHIP. SERVICE DEPT. RAN ALL UPDATES AND THE CAR SHUT OFF ON THEM WHILE TESTING IT TOO. HAS BEEN IN THE SHOP FOR 2 WEEKS AND *THEY SAY IT WAS DUE TO EXCESSIVE OIL CONSUMPTION* AND AR REPLACING THE ENGINE. I DON'T BELIEVE THIS TO THE CAUSE; NEVER GOT A WARNING LIGHT AT ALL AND CAR DOES RESTART AND RUN AFTER IT SHUTS ITSELF OFF. SCARED TO DRIVE IT ONCE I GET IT BACK AGAIN, IT IS REALLY *LIKE A DEATH TRAP WHEN IT SHUTS OFF*. YOU ARE THE MERCY OF ALL THE DRIVERS AROUND YOU TO GET OUT OF YOUR WAY. SOMEONE IS GOING TO GET HURT OR GET KILLED IF THEY DON'T FIGURE THIS OUT SOON. January 18, 2016.

98.    The following are some NHTSA complaints from 2015 and early

2016 for Dodge Dart and Chrysler 200:

- *CAR CONSUMES 1QT OF OIL EVERY 1000 MILES*. THE VALVETRAIN IS HYDRAULIC AND WHEN LOW THE CAR STUTTERS AND STALLS. June 26, 2015, NHTSA complaint for 2013 Dodge Dart.

- TL* THE CONTACT OWNS A 2014 DODGE DART. THE CONTACT STATED THAT *THE ENGINE OIL WAS DEPLETING PREMATURELY. THE DEALER STATED THAT*

- 50 -

*THE ENGINE MOTOR FAILED*. THE DEALER STATED THAT THE MOTOR MAY NEED TO BE REBUILT. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE APPROXIMATE FAILURE MILEAGE WAS 7,000. July 10, 2015, NHTSA complaint for 2014 Dodge Dart.

- TL* THE CONTACT OWNS A 2014 DODGE DART. THE CONTACT STATED THAT *WHILE DRIVING AT APPROXIMATELY 55 MPH, THE VEHICLE STALLED*. THE CONTACT WAS ABLE TO RESTART THE VEHICLE. THE VEHICLE WAS TAKEN INTO THE DEALER WHERE IT WAS INFORMED THAT THE *VEHICLE WAS LOW ON OIL*. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 31,000. THE VIN WAS NOT AVAILABLE. October 30, 2015, NHTSA complaint for 2014 Dodge Dart.

- *CAR STALLED WHILE OPERATING UNDER FULL POWER ON THE INTERSTATE*. IT TOOK APPROX. 3 MINUTES AND IT FINALLY RESTARTED. TOOK CAR TO DEALERSHIP. THEY STATE CAR IS NOT PART OF ANY RECALL BASED ON VIN #. THEY STATE STALLING WAS *RESULT OF EXTREMELY LOW OIL*…. November 13, 2015, NHTSA complaint for 2013 Dodge Dart.

- MY 2014 DODGE DART LOSES OIL. *THE OIL INDICATOR LIGHT DOES NOT WORK*. HOWEVER THE OIL IS NOT LEAKING ON THE GROUND AND ONCE THERE IS NO OIL AT ALL IN THE VEHICLE, IT *SHUTS OFF WHILE DRIVING*. THIS HAPPENS UPON TAKING OFF. THE CAR HAS TO PUT IN NEUTRAL IN ORDER TO START. January 18, 2016, NHTSA complaint for 2014 Dodge Dart.

- TIGER SHARK MULTI-AIR 2 ENGINE CONSUMES 1QT OIL PER 1000 MILES. I WAS UNAWARE OF THIS CONSUMPTION ISSUE AND THE OIL WENT TO LOW AND ENGINE IS DESIGNED TO SHUT OFF. THIS STALLING HAS HAPPEN 3 TIMES TO AND 1 TO THE DEALERSHIP. *NONE OF THE CARS WARNING INDICATORS COME ON WHEN PRESSURE IS LOW THE CAR JUST STALLS*. DEALERSHIP RESOLUTION WATCH OIL LEVEL AND THERE IS FIX FOR THE CONSUMPTION OR ANY WAY FOR THE WARNING

- 51 -

LIGHTS TO BE TRIGGERED. SO IF I FORGET TO CHECK
THE OIL *I AM GAMBLING WITH MY LIFE AND OTHERS ON
THE ROAD IF THE CAR STALLS WHILE ON THE HIGHWAY*.
January 21, 2016, NHTSA complaint for 2014 Dodge Dart.

- *I WAS DRIVING MY BRAND NEW CHRYSLER 200 THAT I
  BOUGHT 4 MONTHS PRIOR AND IT WAS COMPLETELY
  SHUTTING OFF IN THE MIDDLE OF THE ROAD*... I LOST
  CONTROL OF STEERING UNTIL IT SHUT COMPLETELY OFF
  SO I COULD RESTART IT. *VERY SCARY* WHEN YOU HAVE
  YOUR NEWBORN BABY AND 10 YEAR OLD IN THAT BACK
  SEAT. *NOT ONCE DID A CHECK ENGINE LIGHT COME ON
  OR ANY SENSOR COME ON TO TELL ME THAT MY VEHICLE
  HAD NO OIL IN IT*. SO I BELIEVE THE ENGINE, ELECTRICAL,
  AND SENSORS ARE ALL MESSED ON THIS VEHICLE. I DO
  NOT FEEL LIKE I SHOULD BE STUCK WITH IT BECAUSE IN
  THE BACK OF MY HEAD I NO LONGER FEEL SAFE IN THIS
  VEHICLE. I AM REACHING OUT FOR HELP BECAUSE
  CHRYSLER WON'T AND I HAVE OWNED THIS CARE SINCE
  AUGUST AND IT WAS IN SHOP FOR 17 DAYS IN JANUARY, I
  HAVE IT BACK BUT I STILL DON'T THINK IT'S RUNNING
  CORRECTLY. February 7, 2016, NHTSA complaint for 2015
  Chrysler 200.

- *ON 3 SEPARATE OCCASIONS, MY 2013 DODGE DART GT
  WITH A 2.4 TIGER SHARK ENGINE WITH MULTIAIR HAS
  SHUT DOWN WHILE THE CAR WAS MOVING ON THE ROAD*.
  *THE REASON FOR THIS THE DEALERSHIP TOLD ME WAS
  DUE TO LOW OIL*, WHICH WE RECENTLY REALIZED USES
  AT LEAST 1/2 QUART PER 1,000 MILES. THE DEALER SAYS
  THIS IS WITHIN NORMAL LIMITS. THEY SAID THAT BEFORE
  50,000 MILES IT IS WITHIN NORMAL LIMITS TO BURN 1
  QUART FOR EVERY 1000 MILES AND AFTER 50,000 MILES IT
  IS NORMAL TO BURN 1 QUART FOR EVERY 750 MILES. THIS
  WAS NEVER DIVULGED TO ME WHEN I PURCHASED THE
  VEHICLE. IT FIRST DID THIS STARTING AT 35,000 MILES.
  THE VEHICLE NOW HAS 42,000 MILES. *THERE HAS NEVER
  BEEN ANY OIL LIGHT OR ANY OTHER ENGINE LIGHT
  THAT GOES ON BEFORE THE VEHICLE DIES*. IT HAS LEFT
  ME STRANDED IN THE MIDDLE OF THE ROAD IN SOME

- 52 -

VERY DANGEROUS SITUATIONS. I NO LONGER FEEL SAFE DRIVING THIS CAR AND WHO WOULD WANT TO BUY IT FROM ME? *TWO DEALERSHIPS HAVE TOLD ME THAT IT IS NORMAL FOR THE ENGINE ON THIS CAR TO BURN LOTS OF OIL*, TO DIE WHILE THE CAR IS MOVING IF THE OIL IS LOW, AND FOR THE OIL LIGHT NOT TO GO ON BECAUSE THE CAR WILL STOP RUNNING BEFORE THE SENSOR IS ACTIVATED. THEY TELL ME THEY HAVE SEEN THIS BEFORE. THE MAJOR PROBLEM IS THE OIL SENSOR NEVER ACTIVATES TO TELL ME THE OIL IS LOW. *THEY TELL ME TO CHECK THE OIL LEVEL EVERY TIME I PUT GAS IN THE CAR. I FIND THAT TO BE AN UNACCEPTABLE SOLUTION*. THE OIL HAS ALWAYS BEEN CHANGED AT NORMAL INTERVALS. February 10, 2016, NHTSA complaint for 2013 Dodge Dart.

- *I HAVE A 2014 DODGE DART THAT IS BURNING OIL AT WHAT SEEMS TO ME TO BE AN ALARMING RATE*. I HAVE HAD MY VEHICLE IN THE SHOP OVER 4 TIMES. I AM BEING TOLD I HAVE NO LEAKS AND MY CAR IS FINE, AND THAT IT IS CHARACTERISTIC THAT MY CAR NEEDS TO HAVE OIL ADDED EVERY 2K MILES. I DRIVE MY CAR TO AND FROM WORK AND I RARELY TRAVEL OUT OF STATE. I AM NOT OVER DRIVING OR ROUGH DRIVING MY CAR BY ANY MEANS. I HAVE SPENT OVER 1K DOLLARS IN RENTALS AND REPAIRS. I HAVE A 3 YEAR OLD SON THAT I DRIVE TO DAYCARE 4 DAYS A WEEK *AND I CANNOT MENTALLY BE COMFORTABLE DRIVING MY SON IN A CAR THAT STOPS IN THE MIDDLE OF THE ROAD BECAUSE ITS OUT OF OIL*. DODGE HAS DONE NOTHING TO HELP ME AND I AM SEEKING LEGAL ACTION. April 5, 2016, NHTSA complaint for 2014 Dodge Dart.

- AFTER LENGTHY OIL CONSUMPTION TESTS ON CAR BY THE DEALER, I WAS TOLD IT BURNS 1 QUART OF OIL EVERY 1000 MILES AND I WOULD HAVE TO ADD OIL AT THAT RATE. ALSO TOLD THIS WAS "ACCEPTABLE" BY CHRYSLER. *NO LOW OIL LIGHT COMES ON, EVEN WHEN THE ENGINE TOTALLY FAILED AND I HAD TO HAVE IT TOWED TO THE DEALERSHIP*. CURRENTLY HAVE 25000

- 53 -

MILES AFTER 2.5 YEARS OWNED. April 25, 2016, NHTSA complaint for 2013 Dodge Dart.

- THIS VEHICLE HAVE HAD TWO OCCASIONS OF MASTER CYLINDER BRAKE FLUID LOSS AND *UNEXPLAINED TOTALL ENGINE OIL EVAPORATION WITHOUT WARNING THAT CAUSED THE LOSS OF POWER WHILE DRIVING*. LUCKILY IT HAPPENED IN CITY, NOT HIGHWAY. June 17, 2016, NHTSA complaint for 2014 Dodge Dart.

99.     And there are over a hundred NHTSA complaints each for the Jeep

Compass, Jeep Renegade, and Dodge Dart, as well as dozens for the Chrysler 200,

including this sampling:

Dodge Dart

- BURNED OIL AND NEED TO PUT OIL IN AFTER 750 MILES. NEW ENGINE WAS PUT IN, BUT IT STILL HAVE PROBLEMS. THE PROBLEM FIRST STARTED 12/4/17. *I WAS DRIVING MY CAR AND IT COMPLETELY STOP WITHOUT WARNING*. I TOOK IT TO THE DEALER AND IT WAS DETERMINED THAT IT WAS AN ENGINE ISSUE. AFTER 6 MONTHS, THE ENGINE WAS REPLACED. IT WAS BURNING OIL. August 11, 2018, NHTSA complaint for 2013 Dodge Dart.

- THIS IS THE SECOND TIME THIS HAS HAPPENED. *THE ENGINE WILL STALL RANDOMLY WHILE DRIVING*. THE FIRST TIME IT HAPPENED, WE HAD TO HAVE IT TOWED TO THE DEALERSHIP. THEY SAID IT WAS A SENSOR COVERED UNDER WARRANTY. OK GOOD. WELL A FEW DAYS AFTER, THE PROBLEM HAPPENED AGAIN. THIS TIME *THEY SAY IT'S BECAUSE THE OIL NEEDED TO BE CHANGED. THE HUD SHOWED OVER 50% OIL LIFE LEFT*. THE SAME ISSUE HAPPENED AGAIN A FEW DAYS AGO. THE PROBLEM SEEMS TO RESOLVE AFTER AN OIL CHANGE. I'VE NOTICED THIS HAS HAPPENED TO A LOT OF PEOPLE, BUT STILL NO RECALLS. *THIS IS EXTREMELY DANGEROUS*. WHEN THE ENGINE STALLS, YOU LOOSE POWER STEERING AND

- 54 -

BRAKES. THIS CAN CAUSE A MAJOR ACCIDENT. LUCKILY, IT'S ONLY HAPPENED ON SURFACE STREETS. THIS ISSUE NEEDS TO BE LOOKED INTO AND FIXED. July 7, 2017, NHTSA complaint for 2014 Dodge Dart.

- I DON'T KNOW WHAT TO DO WITH THE VEHICLE. IT'S GIVEN ME PROBLEMS SINCE I FIRST BOUGHT IT. THE FIRST TIME I HAD A PROBLEM WITH THIS VEHICLE WAS A MONTH AFTER I PURCHASED IT FROM THE DEALERSHIP. *I WAS DRIVING IT, AND IT SUDDENLY TURNED OFF* AND ALL OF THE LIGHTS ON THE DASHBOARD TURNED ON. NOW IT DOES IT FREQUENTLY. THE LAST TIME WAS LITERALLY THIS 3RD OF OCTOBER. *THE DEALERSHIP MECHANICS SUPPOSEDLY SAID IT HAPPENS BECAUSE THE OIL IS LOW ON THE CAR*, THAT THE CAR'S SYSTEM SHUTS OFF TO PROTECT THE VEHICLE FROM DAMAGE TO THE MOTOR, DUE TO LOW OIL. *IT SEEMS RIDICULOUS THAT CHRYSLER IS WILLING TO RISK THEIR BUYERS WITH SUCH A FAULT SYSTEMS*. ALL THE DEALER SAID WAS THAT IT WAS NORMAL AND NOTHING TO WORRY ABOUT. HOWEVER, WHEN *THIS HAS HAPPENED TO ME IT HAS BEEN WHEN THE OIL LIFE IS AT NO LESS THAN 58%*. IT IS VERY UNSAFE TO DRIVE THIS VEHICLE. I CAN CRASH AT ANY MOMENT. AND THE MOTOR JUST BURNS THROUGH OIL LIKE CRAZY. MY MECHANIC CHECKED IT AFTER MAYBE THREE WEEKS OF AN OIL CHANGE AND IT WAS COMPLETELY OUT OF OIL ALREADY. IT SEEMS LIKE. October 11, 2017, NHTSA complaint for 2014 Dodge Dart.

- *CAR STALLS WITHOUT WARNING* IN ALL SORTS OF SCENARIOS, JUST STARTED, TURNING, STOPPING, UP HILL OR DOWN HILL. *MULTIPLE INQUIRIES WITH CHRYSLER CORPORATE AND DEALERSHIPS* RESULTED IN THEM TELLING ME THE CAR IS ENGINEERED TO ALLOW 1QT OF OIL BURNED EVERY 750 MILES, PER SPEC SHEET I HAD TO FIRMLY DEMAND TO BE ABLE TO SEE IT. WAS *BASICALLY TOLD THERE IS NO PROBLEM THAT MY CAR DIES IN THE MIDDLE OF AN INTERSECTION WITH MY FAMILY IN IT*, THEREBY THE POTENTIAL FOR A MAJOR CATASTROPHIC DEADLY SITUATION IS THERE. CHYRSLER

- 55 -

CORPORATE CASES WERE CLOSED WITH NO RESOLUTION AND THEY NEARLY MADE ME PAY FOR THE INQUIRY. November 6, 2019, NHTSA complaint for 2014 Dodge Dart.

- I PURCHASED A 2015 DODGE DART 3/19/18 FROM A DEALERSHIP. I JUST HAD THE OIL CHANGE DONE WHICH WAS RECOMMENDED. THE CAR JUST RECENTLY STARTED TO STALL WHILE DRIVING. NO WARNING LIGHTS WENT ON. WE CHECKED THE BATTERY (WHICH WAS A YEAR OLD) AND THE ALTERNATOR AND THEY WERE FINE. I WENT TO AUTO ZONE TO CHECK IT OUT. I CALLED THE DEALERSHIP I BOUGHT IT AT AND THEY SAID IT COULD BE A NUMBER OF THINGS. NEVER DID THEY MENTION THE OIL BEING THE ISSUE. *I GET A CALL FROM THE DEALERSHIP THAT THE BECAUSE THE OIL WAS LOW THE CAR WILL STALE TO PROTECT THE ENGINE. FIRST OF ALL, IT'S A SAFETY HAZARD IF THIS CAN RANDOMLY STALL, AND SECOND NO LIGHTS CAME ON FOR THE WARNING.* THE CARS METERS SHOWED THAT THE OIL QUALITY WAS AT 85% AND GOOD. THIS IS VERY DANGEROUS. I CHECKED THE OWNERS MANUAL AND THERE IS NOTHING THAT PERTAINS TO THIS CAR STALLING. July 11, 2018, NHTSA complaint for 2015 Dodge Dart.

- TL* THE CONTACT OWNS A 2016 DODGE DART. IN OCTOBER OF 2016, WHILE DRIVING 25 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO A LOCAL DEALER (NAPLETON CHRYSLER JEEP DODGE RAM, 1460 E OSCEOLA PKWY, KISSIMMEE, FL 34744) WHERE IT WAS DIAGNOSED THAT THERE WAS INADEQUATE OIL IN THE VEHICLE DURING PRODUCTION, WHICH CAUSED THE SENSOR TO SHUT THE VEHICLE DOWN. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED. WHILE DRIVING 40 MPH, THE OIL INDICATOR WAS FLASHING. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHERE A COMPRESSION TEST WAS COMPLETED. *THE DEALER DIAGNOSED THAT THE OIL WAS EVAPORATING AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND*

- 56 -

*DENIED THE CLAIM*. THE MANUFACTURER ADVISED THE CONTACT TO ADD OIL AND REFER TO THE OWNER'S MANUAL. THE FAILURE MILEAGE WAS 15,638. December 12, 2017, NHTSA complaint for 2016 Dodge Dart.

Chrysler 200

- CAR WILL STALL WHILE COMING TO A STOP OR SLOWING TO MAKE A TURN. TOOK IT IN TO THE DEALERSHIP AND WAS TOLD THAT THE OIL NEEDED TO BE CHANGED AND THAT THE ENGINE WOULD AUTOMATICALLY "SHUT OFF" IF AN OIL CHANGE IS NEEDED. *PROBLEM HAS OCCURRED NUMEROUS TIMES EVEN AFTER HAVING THE OIL CHANGED REGULARLY*. November 1, 2016, NHTSA complaint for 2015 Chrysler 200.

- CAR BURNS ENTIRE SUPPLY OF OIL IN LESS THAN 1500 MILES. ENGINE OIL DEPLETES WITHOUT WARNING THEN THE *CAR CUTS OFF IN THE MIDDLE OF THE ROAD. OIL LIFE READS IMPROPERLY ON THE DASH*. November 29, 2016, NHTSA complaint for 2015 Chrysler 200.

- HAD THE CAR SINCE APRIL OF THIS YEAR. CUT OFF OVER 20 TIMES AND CONSUMES OIL A LOT. I MEAN I'M ADDING OIL EVERY 700 MILES ALMOST. *CAR HAS LEFT ME IN THE MIDDLE OF INTERSECTIONS WITH MY FAMILY IN DANGER*. November 27, 2017, NHTSA complaint for 2015 Chrysler 200.

- MY CAR HAS SHUT OFF 3 TIMES JUST THIS WEEK WHILE DRIVING. EACH TIME I WAS IDLING AT A STREET LIGHT. THE DASH SAYS TO PUT CAR BACK IN PARK AND THEN IT TAKES A COUPLE OF TRIES TO RESTART IT. TOOK IT TO THE DEALER THEY SAID I HAVE NO OIL. BUT I JUST HAD AN OIL CHANGE NOT TOO LONG AGO AND I HAVE NO LEAKS. THIS CAR IS CONSUMING WAY TOO MUCH OIL. *NO WARNING LIGHT CAME ON THAT I WAS LOW ON OIL. I WAS IN A YIELDING LEFT HAND TURNING LANE WHEN THE CAR SHUT OFF 2 OF THE 3 TIMES. IF IT HAD HAPPENED A FEW SECONDS LATER I COULD HAVE BEEN T-BONED WITH MY SON IN THE CAR ON THAT SIDE. VERY*

- 57 -

*DANGEROUS!!!!!* THIS SHOULD BE RECALLED. December 1, 2017, NHTSA complaint for 2015 Chrysler 200.

- MY 2016 CHRYSLER 200 WAS PURCHASED BRAND NEW, HAS ONLY 15000 MILES. WHEN PULLING INTO TRAFFIC THE ENGINE SHUTS OFF. DASHBOARD PROMPT SAYS PUT IN PARK TO START.CAR WON'T START UNTIL AFTER 3 ATTEMPTS AND IN THE MIDDLE OF TRAFFIC AND SEVERAL NEAR MISSED REAR ENDERS CAR STARTED BUT STUTTERING AND NO POWER. FINALLY AFTER SITTING IN THE MIDDLE OF TRAFFIC FOR 5 OR 10 MINUTES ENGINE SMOOTHED OUT. *NO WARNING AT ALL. EXTREMELY SCARY AND DANGEROUS, BOTH TIMES CAR WAS IN MOTION TURNING ONTO A BUSY STREET IN HEAVY TRAFFIC, ENGINE JUST SHUT OFF FOR NO REASON. DEALERSHIP SAID OIL CHANGE WAS NEEDED BUT OIL LIFE GAUGE SAID 51%* AND OIL CHANGE WASN'T DUE FOR ANOTHER 500 MILES.TECH.AT THE DEALERSHIP SAID IT WAS A SAFETY FEATURE. I DON'T SEE ANYTHING SAFE ABOUT THE ENGINE SHUTTING OFF IN THE MIDDLE OF TRAFFIC. VERY UNSAFE AND DANGEROUS. SHOULD BE A RECALL FOR THIS BEFORE SOMEONE HURT OR KILLED. February 3, 2018, NHTSA complaint for 2016 Chrysler 200.

- I HAVE NOTICED THAT MY 2016 CHRYSLER 200 IS BURNING OIL AT AN ALARMING RATE. I DIDN'T EVEN KNOW IT WAS LOW BECAUSE THERE IS NO SENSOR THAT SHOWS UP ON THE DASH LETTING ME KNOW THE OIL WAS LOW. *THE "OIL CHANGE LIFE" IS STILL AT 20% LIFE BUT MY CAR HAS BURNED THRU OVER 4 QUARTS OF OIL IN 4,000 MILES!! I FIND THIS EXTREMELY CONCERNING NOT TO MENTION THE POSSIBLE ENGINE DAMAGE THAT CAN BE DONE WITH A CAR BURNING THIS MUCH OIL*. THERE SHOULD BE AN ALERT TO DRIVERS LETTING THEM KNOW THE OIL LEVELS ARE LOW. I HAVE NEVER HAD A CAR THAT BURNED OIL LIKE THIS! September 17, 2018, NHTSA complaint for 2016 Chrysler 200.

Jeep Compass

- ENGINE OIL AND STALLING. I WENT FOR MY 2ND OIL CHANGE 8/27/2018. THE SERVICE TECH AND A MECHANIC LISTENED WHEN I SAID THE OIL WAS BASICALLY GONE AND MY HUSBAND HAD TO ADD 2 QUARTS. I EVEN CHECKED ALL THE SYSTEM WARNINGS AND THERE IS NONE FOR LOW OIL. WHEN PULLING OUT INTO AN INTERSECTION *THE CAR TOTALLY SHUT OFF AT 4 DIFFERENT TIMES. SO THE MECHANIC SAID YES THOSE 2.4 ENGINES BURN 1 QUART EACH 1000 MILES AND WHEN THE OIL IS LOW THE ENGINE WILL JUST STOP. I ASKED ABOUT WHY THERE ARE NO WARNING LIGHTS, THE MECHANIC AGAIN SAID YES THERE IS NOT ONE. HAVING A CAR JUST SHUT OFF IS SO DANGEROUS.* IT COULD HAVE BEEN A TERRIBLE ACCIDENT IF ANOTHER CAR WAS COMING ANY OF THOSE 4 SHUT OFFS…. September 4, 2018, NHTSA complaint for 2017 Jeep Compass.

- VEHICLE SHUTS DOWN WHILE OPERATING. TOOK IT TO THE DEALER AND THE *DEALER SAID IT USES A QUART OF OIL EVERY 500 MILES THEREBY BY CAUSING ENGINE TO SHUT DOWN DURING OPERATION*. DEALER STATED CHRYSLER IS AWARE OF PROBLEM AND NO SOLUTIONS HAVE BEEN PROVIDED YET. DEALER ALSO STATED TO GET AN OIL CHANGE EVERY 3000 MILES. THIS VEHICLE HAS 33,720 MILES AND WAS PURCHASED JUN 2017. November 5, 2019, NHTSA complaint for 2017 Jeep Compass.

- WHEN PULLING OUT OF THE DRIVEWAY AND GOING FROM REVERSE TO DRIVE *THE CAR STALLED IN THE MIDDLE OF THE STREE*T. THIS HAPPENED A FEW WEEKS AGO ALSO. I CALLED THE DEALERSIP AND THEY SAID IF THE OIL IS LOW THERE IS A SAFETY FEATURE THAT SHUTS DOWN THE ENGINE. *THIS CAR ONLY HAS 3000 MILES ON IT AND IS 3 MONTHS OLD. NO ENGINE LIGHT OR WARNING EVER CAME ON*. I CHECKED THE OIL AND IT WAS A LITTLE LOW SO I ADDED A 1/2 A QUART. IN READING UP ON THIS VEHICLE IT SAYS IT BURNS QUITE A BIT OF OIL. THIS IS UNACCEPTABLE THAT THE CAR BURNS THIS

- 59 -

MUCH OIL AND THAT THE CAR WILL SHUT DOWN IF
THE OIL IS A LITTLE BIT LOW. THIS IS MORE OF A SAFETY
HAZARD IF THE CAR SHUTS DOWN WHILE DRIVING?
September 21, 2018, NHTSA complaint for 2018 Jeep Compass.

- *I HAVE ABOUT 5500 MILES ON MY NEW COMPASS*. WHILE
  IN DRIVE THE VEHICLE DISPLAY FLASHED "OIL PRESSURE
  LOW" FOR LESS THAN A SECOND. THEN ANY INDICATION
  OF THAT WARNING LIGHT IS GONE. THE ENGINE THEN
  SHUTS DOWN WITH NO WARNING. NO BRAKE LIGHTS
  WHICH MAKES THIS EXTREMELY UNSAFE FOR THE
  POTENTIAL OF A REAR END CRASH. I TOOK THE CAR TO
  THE DEALERSHIP WHO SAID THAT THE ENGINE
  CONSUMED 3 QUARTS OF OIL. *THERE WAS NO INDICATION
  THAT THE CAR WAS LOW ON OIL UNTIL A SECOND
  BEFORE THE ENGINE STALLED AND TURNED OFF*.
  December 4, 2018, NHTSA complaint for 2018 Jeep Compass.

- WAS DRIVING AND WENT TO TURN AND *THE JEEP
  TURNED OFF WITH NO WARNING*. IT TOOK ME A MINUTE
  FOR IT TO START AGAIN. THE NEXT DAY I WAS TURNING
  ONTO THE HIGHWAY AND THE JEEP DID THE SAME THING.
  I'M LUCKY THAT THERE WAS AN AREA FOR ME TO BE
  ABLE TO COAST INTO ON THE SIDE OFF THE ROAD OR I
  COULD HAVE BEEN IN A SERIOUS ACCIDENT. *HAD THE
  JEEP TOWED TO THE CLOSET DEALERSHIP AND THEY
  INFORMED ME THERE WAS NO OIL IN THE JEEP. I HAD 1K
  MILES LEFT TO MY NEXT OIL CHANGE* AND GET
  MY OIL CHANGED ALWAYS BEFORE 5K MILES. *THE
  DEALERSHIP TOLD ME THESE JEEPS BURN OIL FASTER
  THAN THEY SHOULD* AND I SHOULD BUY
  SYNTHETIC OIL TO CARRY IN THE JEEP AND CHECK
  MY OIL EVERY COUPLE OF HUNDRED MILES. THIS SHOULD
  NOT BE THE SOLUTION, AS *I WOULDN'T HAVE
  PURCHASED THE JEEP IF THEY TOLD ME I HAD TO
  CARRY OIL AROUND WITH ME & CHECK MY OIL EVERY
  COUPLE OF HUNDRED MILES.* THIS ISSUE IS DANGEROUS,
  AS THERE IS NO WARNING THAT YOUR OIL IS LOW
  BEFORE THE JEEP TURNS OFF. I TRAVEL AT LEAST 100
  MILES A DAY FOR WORK AND I DON'T FEEL SAFE IN THIS

- 60 -

VEHICLE AND SHOULDN'T HAVE TO CHECK MY OIL EVERY
OTHER DAY. April 2, 2019, NHTSA complaint for 2018 Jeep
Compass.

- ***JEEP COMPASS IS A SAFETY HAZARD DEATH TRAP; I
  CANNOT BELIEVE THERE IS NOT A RECALL ON IT! IT
  LITERALLY BURNS OIL DOWN TO NOTHING & WITH NO
  WARNING WHATSOEVER THE PARKING BRAKE ENGAGES,
  THE DASHBOARD LIGHTS UP AND IT JUST STOPS, WHILE
  DRIVING, ON THE ROAD, IN TRAFFIC!*** THIS HAS
  HAPPENED TO ME TWICE! I HAVE CHANGED
  THE OIL REGULARLY (ACTUALLY EARLY) AND AFTER
  3,000 MILES IT IS EMPTY?? ARE YOU SERIOUS? FIRST TIME
  IT HAPPENED THE DEALER CONDUCTED AN
  "OIL CONSUMPTION" TEST, WHAT A JOKE. OBVIOUSLY IT
  IS OVER-CONSUMING OIL BECAUSE IT JUST SEIZED UP ON
  ME WHILE DRIVING & MAKING A TURN IN FRONT OF
  OTHER CARS AND THE DIPSTICK WAS CLEAR, NOT ONE
  DROP OF OIL LEFT! MADE SPECIAL TRIPS TO THE DEALER
  SO THEY COULD TOP OFF THE OIL AFTER 1,500 MILES
  (THEIR SOLUTION TO THIS KNOWN PROBLEM) AND IT
  HAPPENED A SECOND TIME AFTER LESS THAN 3,000 MILES,
  AND ONCE AGAIN WHILE MAKING A TURN I WAS ALMOST
  REAR ENDED BECAUSE THE JEEP STOPPED IN THE MIDDLE
  OF THE ROAD!!! THE JEEP IS CURRENTLY AT THE DEALER
  WHILE THEY "FIGURE OUT WHAT IS WRONG" AND HOW TO
  HANDLE IT. I WILL TELL YOU HOW TO HANDLE IT, RECALL
  THEM BEFORE SOMEONE DIES!!! IF I COULD DITCH
  JEEP/CHRYSLER RIGHT NOW I WOULD, AND AS SOON AS
  MY LEASE IS UP, I WILL BE GOING BACK TO GM CARS!
  August 15, 2019, NHTSA complaint for 2018 Jeep Compass.

- WHILE DRIVING IN A PARKING LOT, ***MY CAR SHUT OFF***
  INSTANTLY, NO WARNING. THANK GOD I WAS NOT ON
  THE HIGHWAY OR THAT A CAR WAS NOT DRIVING BEHIND
  ME! MY HUSBAND CHECKED THE OIL AND IT WAS
  EXTREMELY LOW. CAR ***ONLY HAS, 2,840 MILES ON IT***.
  BOUGHT THE CAR NEW ON, 6/30/2018, WITH ONLY, 28
  MILES ON IT. ***WE TOOK THE CAR TO THE JEEP
  DEALERSHIP AND WAS TOLD THE OIL WAS EMPTY AND***

- 61 -

*THE ENGINE IS BURNING OIL*. *HE SAID THIS IS HAPPENING WITH THIS MODEL AND OTHER JEEP/DODGE VEHICLES WITH THIS MOTOR*. THE MECHANIC DID AN OIL CHANGE AND STATED TO BRING THE CAR BACK AFTER 500 MILES TO CHECK THE OIL AGAIN. *HE STATED IF THE OIL LOST HAPPENS AGAIN, THEY WOULD HAVE TO REPLACE THE ENGINE, WITH THE SAME TYPE OF ENGINE AND HOPE FOR THE BEST*. I THINK THIS IS ABSURD FOR A NEW VEHICLE WITH SO LITTLE MILES ON IT! FIAT/CHRYSLER IS NO HELP AND WILL NOT GIVE ANY OPTIONS OTHER THAN REPLACING THE ENGINE. SHAMEFUL AND SHOWS THEY DO NOT VALUE THEIR CUSTOMERS TIME NOR FEELINGS. THEY CONTINUE TO MAKE THESE CARS WITH THESE SAME DEFECTED ENGINES. IF YOU SEARCH, JEEP BURNING OIL, YOU WILL FIND A TON OF COMPLAINTS. February 6, 2019, NHTSA complaint for 2018 Jeep Compass.

- *BURNING EXCESSIVE OIL. HAD TO GET NEW MOTOR. SECOND MOTOR IS BURNING OIL.* GOING THROUGH SECOND OIL CONSUMPTION TEST. 2018 JEEP COMPASS WITH 11,500 MILES. STILL UNDER WARRANTY. VEHICLE CAN STOP WITHOUT WARNING, ANYWHERE AT ANY TIME. December 12, 2019, NHTSA complaint for 2018 Jeep Compass.

- THIS IS MY THIRD COMPLAINT ON THIS 2019 JEEP COMPASS. *WHILE DRIVING THE VEHICLE STALLS* AND THE EMERGENCY BRAKE AND OTHER LIGHTS COME ON. THE VEHICLE IS UNABLE TO BE RESTARTED AND HAS TO BE TOWED. THE DEALERSHIP HAS UPDATED SOFTWARE, AND NOW HAS SAID THAT THE CAR IS LOW ON OIL EVERY THREE WEEKS AND THAT'S WHY IT STALLS IN THE MIDDLE OF TRAFFIC EXTREMELY DANGEROUS AND I HAVE A BABY ON THE WAY!. *THE OIL CHANGE INDICATOR DOESN'T EVER SHOW UP AND THE MANUFACTURER JUST GIVES THE RUN AROUND*. August 23, 2019, NHTSA complaint for 2019 Jeep Compass.

Jeep Renegade

- MULTIPLE TIMES SINCE OWNING THIS VEHICLE THE PAST 7 MONTHS, I HAVE HAD TO GET 3 OIL CHANGES AND TOP OFF THE OIL MANY TIMES IN BETWEEN, WHICH IS MUCH MORE THAN THE MANUAL STATES IS NECESSARY. *THIS VEHICLE BURNS THROUGH OR LOSES OIL TOO QUICKLY, WHICH CAUSES THE VEHICLE TO TURN OFF WHILE DRIVING (IN MOTION) WHICH IS A HUGE SAFETY CONCERN*. IT OFTEN TURNS OFF GOING UP OR DOWN HILL, AND AFTER OR MID TURN (WHAT LITTLE OIL IS REMAINING SHIFTS) ON CITY STREETS. MY CAR HAS TURNED OFF ITSELF IN THE MIDDLE OF TRAFFIC MORE THAN A DOZEN TIMES. SOMETIMES IT TAKES A COUPLE MINUTES BEFORE IT WILL TURN ITSELF BACK ON. LIKE MENTIONED, THIS HAS OCCURRED MORE THAN A DOZEN TIMES SINCE MAY 2018 (PURCHASED VEHICLE IN MARCH 2018). BETWEEN 10/29 AND 10/31, IT OCCURRED 9 TIMES. November 1, 2018, NHTSA complaint for 2015 Jeep Renegade.

- EXCESSIVE OIL CONSUMPTION . 30000 MILES IN THE ENGINE AND IT *GOES THROUGH OIL MORE OFTEN THAN THE RECOMMENDED OIL CHANGES*. MAJOR ACCIDENT ISSUE, CAUSED BY ENGINE STALLINGS DUE TO UNEXPECTEDLY LOW OIL. *ENGINE STALLED WHILE DRIVING 65MPH ON THE FREEWAY*. August 29, 2019, NHTSA complaint for 2015 Jeep Renegade.

- *THE CAR STALLS FREQUENTLY WITH NO WARNING AT SPEED AND ALSO WHEN EXECUTING A STOP*. IT USES A HUGE AMOUNT OF OIL, 5 QTS BETWEEN CHANGES. I TOOK IT TO THE *DEALER AND THEY TOLD ME THAT THIS CAR STALLS IF THE OIL LEVEL IS LOW*. THIS MEANS THEY RECOGNIZE AN ISSUE AND HAVE DONE NOTHING ABOUT IT. HOW WOULD I KNOW THIS, AND HOW LOW DOES THE OIL HAVE TO BE TO STALL? *THIS IS NOT NORMAL AND IF IT IS 'NORMAL' WHY HAVE THEY NOT TOLD ALL RENEGADE OWNERS?* I WILL NEVER FEEL SAFE IN THIS CAR BECAUSE IF IT STALLS ON THE FREEWAY AT 60 MPH I

- 63 -

WILL MOST CERTAINLY HAVE A CRASH. May 17, 2019,
NHTSA complaint for 2016 Jeep Renegade.

- I HAVE A 2017 JEEP RENEGADE, THE CAR IS RUNNING OUT
OF OIL , I'VE TAKEN THE CAR TO THE DEALER MULTIPLE
TIMES AND IT SEEMS THAT *THE ENGINE KEEPS BURNING
THE OIL WITHOUT ANY AND THE CAR HAS SHUT DOWN
ON ME WHILE DRIVING WITHOUT ANY ALERTS
REPORTING ME THAT THE CAR DOES NOT HAVE OIL*, I
HAVE TO KEEP CHECKING THE OIL TO MAKE SURE IS
RIGHT TO AVOID THE CAR SHUTTING DOWN ON ME WHILE
I'M DRIVING, IS REALLY DANGEROUS THAT THE CAR IS
BURNING THE WHOLE MOTOR OIL EVERY 500 MILES
WHIOUT HAVING ANY LEAKING OR SHOWING
LOW OIL ALERT SIGNS AND THE DEALER CAN'T FIX IT ,
THE DEALER SHOULD BE ABLE TO REPLACE THE DAMAGE
TO AVOID ANY ACCIDENT THIS CAR IS WORSE THAN
HAVING AN OLD 1987 CAR. March 18, 2019, NHTSA complaint
for 2017 Jeep Renegade.

- *OIL CONSUMPTION ISSUES. CAR SHUTS OFF WHILE
DRIVING WITHOUT ANY WARNING. THIS ALMOST CAUSED
ME TO BE INVOLVED IN A CAR CRASH*. THIS OCCURRED
THREE TIMES WITHIN 24 HOURS WITH MY CAR. TOOK THE
CAR TO JEEP SERVICE AND THE ATTENDANT STATED
THAT THIS CAR "CONSUMES 1 QUART OF OIL EVERY 1,000
MILES" AND THAT I SHOULD CALL CORPORATE. WHEN I
BROUGHT THE CAR TO JEEP IT WAS OUT OF OIL WITH NO
WARNING OF A NEED FOR AN OIL CHANGE OR THAT I WAS
LOW ON OIL.

  *WHEN I BOUGHT THIS CAR FROM THE DEALERSHIP I WAS
  NOT MADE AWARE* THAT I WOULD NEED TO CHANGE
  THE OIL THIS OFTEN AND THAT THIS CAR "CONSUMES"
  THIS MUCH OIL REQUIRING CONSTANT SERVICE. *IT IS
  ALSO NOT STATED IN THE OWNERS MANUAL*.

  *THE ISSUE WITH THIS CAR COULD CAUSE A HORRIBLE
  COLLISION*, AS WHILE THE CAR IS IN MOTION IT
  COMPLETELY TURNS OFF THE ENGINE. WHEN THIS

- 64 -

HAPPENED TO ME I WAS IN THE MIDDLE OF A TURN AND
WHEN I PRESSED THE GAS TO ACCELERATE THE CAR JUST
ROLLED BECAUSE THE ENGINE WAS SHUT OFF AND I HAD
NO POWER STEERING. AS THIS OCCURRED ANOTHER CAR
WAS COMING, LUCKILY THEY HAD A STOP SIGN. March 25,
2019, NHTSA complaint for 2017 Jeep Renegade.

- ***CAR WOULD NOT GIVE GAS AND COMPLETELY STALLED
  OUT ON ME***, AND CUT OFF!! IT WOULD NOT TURN BACK
  ON FOR SEVERAL MINUTES. I ALMOST GOT REAMED BY A
  LARGE DUMP TRUCK BECAUSE THIS HAPPENED IN THE
  MIDDLE OF A BACK WINDY ROAD!! ALSO, MY CAR IS
  SLIPPING OUT OF GEAR FROM 1ST, 2ND, AND 3RD!
  ***DEALERSHIP TELLS ME I WAS ALMOST OUT OF OIL????
  HOW CAN THIS BE? I GET REGULAR OIL CHANGES, AND
  FUNNY THING IS, THEY ALWAYS TELL ME I'M LOW!!??*** I'M
  FIRST OWNER, PURCHASED IN NOVEMBER 2017! ONLY
  HAVE 36,000 MILES! ***NOW DEALERSHIP TELLING ME THIS
  IS "NORMAL" FOR RENEGADE? WHY WASNT I INFORMED
  BEFORE PURCHASING!!!*** THIS IS A MAJOR SADETY
  HAZARD! I WAS ALMOST SERIOUSLY INJURED, THE DUMP
  TRUCK SCREACHED TO A HALT BY A MATTER OF
  INCHES!!!! September 24, 2019, NHTSA complaint for 2017 Jeep
  Renegade.

- ***THE 2018 JEEP RENEGADE STALLED AS I WAS TURNING IN
  MY DRIVEWAY. CHECKED THE OIL AND THERE WAS
  NO OIL ON THE DIPSTICK. NO LIGHTS CAME ON. IT HAD
  ONLY 4000 MILES ON IT***. NOT EVEN TIME FOR ITS
  FIRST OIL CHANGE. NEVER HAD A NEW VEHICLE THAT
  HAD USED OIL. THIS IS NOT SAFE. IT COULD HAVE
  STALLED ON ME ON THE HIGHWAY. September 26, 2018,
  NHTSA complaint for 2018 Jeep Renegade.

- ***I BOUGHT A BRAND NEW 2018 JEEP RENEGADE. AT
  APPROXIMATELY 2,500 MILES THE CAR WOULD SHUT OFF
  ON ME WHILE DRIVING. NO WARNING LIGHTS CAME ON***.
  IT SHUT OFF TWICE WHILE DRIVING STRAIGHT AND TWICE
  WHILE MAKING LEFT HAND TURNS. AFTER THE FIRST
  TIME IT SHUT OFF, IT DIDN'T HAVE THE PICKUP IT HAD

- 65 -

BEFORE AND SEEMED TO SPUTTER. *I TOOK IT TO A JEEP DEALERSHIP AND THEY SAID THAT I WAS OUT OF OIL*. THEY TOPPED IT OFF AND SENT ME ON MY WAY.

*AT 5,500 MILES MY CAR SHUT OFF ON ME AGAIN WHILE DRIVING. THIS WAS VERY SCARY*. IT OCCURRED WHILE MAKING A LEFT HAND TURN AT A LARGE INTERSECTION. I THOUGHT I WAS GOING TO GET HIT. LOST ALL POWER STEERING AND CAR TOOK TIME TO RESTART. AGAIN, THE CAR SPUTTERED AFTER THAT AND TURNED OFF A COUPLE OF MORE TIMES BEFORE I COULD GET BACK TO DEALERSHIP.

MY CAR IS NOW IN FOR AN OIL CONSUMPTION TEST. I HAVE RESEARCHED THIS ISSUE AND SEE THAT THERE ARE MANY OTHER COMPLAINTS OF THE SAME ISSUE. A BRAND NEW CAR SHOULD NOT BE SHUTTING OFF WHILE DRIVING. THIS IS A SAFETY ISSUE. SOME WARNING LIGHT NEEDS TO IDENTIFY THERE IS A PROBLEM. CHECKING THE OIL EVERY 1,000 MILES IS UNACCEPTABLE FOR A NEW CAR.

*THIS IS VERY DANGEROUS. WILL IT TAKE LIVES LOST FOR ACTION TO BE TAKEN?* May 6, 2019, NHTSA complaint for 2018 Jeep Renegade.

- I PURCHASED AND HAVE DRIVEN A NEW 2018 JEEP RENEGADE 2.4 AUTO SINCE DECEMBER 2018. I WAS DRIVING THE OTHER DAY AND TURNED INTO TRAFFIC WHEN *UNEXPECTEDLY THE LOW OIL LIGHT CAME ON IN MY VEHICLE AND IT COMPLETELY SHUT DOWN! TOTAL POWER LOSS. I WAS ALMOST DEMOLISHED BY A FULLY LOADED LOG TRUCK.* I PARKED THE CAR AND CHECKED THE OIL PER THE INSTRUCTION MANUAL PROCEDURE. IT WAS *OVER 2 QTS. LOW IN 5,000 MILES OF DRIVING*.

I HAVE TRIED MULTIPLE TIMES AND THE *JEEP DEALERSHIP* REFUSED TO PROVIDE ME WITH ANY REPAIR DOCUMENTS AFTER INSPECTION. THEY *TOLD ME THE PROBLEM IS WELL KNOWN BUT FCA IS DOING NOTHING TO REMEDY IT AND THEIR SERVICE DEPARTMENT WAS*

- 66 -

***NOT GOING TO DO ANY FURTHER EVALUATION*** INTO THE PROBLEM.THIS WAS NOT DISCLOSED TO ME IN ANY WAY BEFORE I PURCHASED THE VEHICLE NOR IS IT MENTIONED OR INCLUDED AT ALL IN THE OWNERS/ MAINTENANCE MANUAL. IN ADDITION I HAD TO PAY $85.00 FOR AN OIL CHANGE THAT SHOULD NOT HAVE EVEN BEEN NECESSARY. THESE VEHICLES ARE NOT SAFE TO DRIVE***. I NOW HAVE TO PARK MY NEARLY NEW VEHICLE BECAUSE I AM TERRIFIED TO DRIVE THIS CAR IN TRAFFIC.*** THEY ARE STILL SELLING THESE THINGS! PLEASE MAKE THEM STOP, THEY ARE DANGEROUS VEHICLES TO DRIVE.*DT*JB July 18, 2019, NHTSA complaint for 2018 Jeep Renegade.

- ….THIS SUMMER, I HAD TO COMPLETE AN OIL CONSUMPTION TEST ON MY VEHICLE. THIS CONSISTED OF ME DRIVING TO THE DEALERSHIP EVERY 1,000 MILES FOR THEM TO CHECK MY OIL, CHART HOW MUCH IT USED, AND FILL IT BACK UP WITH OIL. THE DISTANCE FROM MY HOUSE TO THE DEALERSHIP IS 35 MILES; QUICKEST ROUTE BEING A 46 MINUTE DRIVE. I HAD TO REPEAT THIS PROCESS 5 TOTAL TIMES. ***AT THE END OF THE 5,000 MILES I WAS TOLD BY MY SERVICE TECHNICIAN (ALLAN) THAT I MISSED THE CUT OFF FOR RECEIVING A NEW ENGINE BY ABOUT ½ QUART OF OIL. HE ALSO EXPRESSED THAT HIS PERSONAL OPINION MAY BE DIFFERENT, BUT THAT THE STANDARD/GUIDELINES WAS WHAT HE HAD TO GO BY FOR DIAGNOSING THE RESULTS***. October 1, 2019, NHTSA complaint for 2018 Jeep Renegade.

- THIS IS THE FOURTH TIME IN THREE MONTH MY VEHICLE HAS LOCKED UP, TOLD ME TO SWITCH GEARS AND ***COMPLETELY SHUT OFF. I WAS ON THE INTERSTATE AND WAS ALMOST REAR ENDED BECAUSE OF THIS! THE CAR CONTINUES TO DO THIS DESPITE GETTING THE RECOMMENDED OIL CHANGES. MY OIL WAS JUST CHANGED 2,000 MILES AGO.*** SOMEONE IS GOING TO DIE AND THIS NEEDS TO BE RECALLED! HUNDREDS OF RENEGADE OWNERS ARE HAVING THIS ISSUE. DANGEROUS! I HAVE CHILDREN AND THIS CAR IS LESS

- 67 -

THAN TWO YEARS OLD AND SHUTTING OFF? March 28, 2020, NHTSA complaint for 2018 Jeep Renegade.

100.    And there are also scores of complaints posted on various consumer forums, such as www.cargurus.com, www.carcomplaints.com, www.myjeepcompass.com, and www.carproblemzoo.com, as well as on Facebook and Twitter. All of these complaints support FCA's knowledge of the defects.

**5.    Acknowledgements of the pervasiveness of the defects by dealerships also supports that FCA would have known early on about them.**

101.    FCA's knowledge of the defects is also shown by the fact that FCA dealers and technicians have admitted to Class Vehicle owners that the Oil Consumption and Oil Indicator defects are common problems with the Vehicles. For example:

- AFTER WORK I GO TO START MY CAR AND THERE WAS A HARD START AND THEN MY CAR DIED. THE ENGINE FELT LIKE IT WAS GOING TO POP OUT OF THE HOOD. WELL, CHRYSLER WAS INFORMED AND MY CAR WAS TOWED NEXT DAY TO THE DEALERSHIP. MY SERVICE MAN CALLED APPROXIMATELY 45 MIN AFTER MY CAR WAS DELIVERED TO THEM EXPLAINING TO ME I WAS ABOUT 2 QUARTS LOW ON OIL. THIS IS IMPOSSIBLE I EXPLAINED TO HIM. ON THE DRIVER SIDE THERE IS A STICKER SHOWING I JUST GOT MY OIL CHANGE NOT TO LONG AGO. *MY SERVICE MAN SAID THIS IS A KNOWN PROBLEM WITH THIS ENGINE*. THIS TYPE OF ENGINE BURNS OIL AND I RECOMMEND WHEN YOU FILL UP YOUR TANK TO CHECK YOUR OIL EVERY TIME. I FILL UP ONCE A WEEK SO I HAVE TO CHECK MY OIL ONCE A WEEK!? THIS IS RIDICULOUS MY NEW CAR BURNS OIL!? GOOD THING THIS HAPPENED AFTER WORK. WHAT IF MY CAR WOULD HAVE STALLED

- 68 -

WHILE DRIVING WITH MY KIDS. I DRIVE ACROSS TOWN TO TAKE AND PICK UP MY KIDS FROM SCHOOL. NOW I HAVE TO CARRY A QUART OF OIL SO MY CAR DOESN'T STALL AND DIE ON ME. May 10, 2017, NHTSA complaint.

- TL* THE CONTACT OWNS A 2015 DODGE DART. WHILE DRIVING AT AN UNKNOWN SPEED, THE ENGINE STALLED. THE VEHICLE WAS ABLE TO BE RESTARTED. THE VEHICLE WAS TAKEN TO LARRY ROESCH CHRYSLER, DODGE, JEEP, RAM (200 WEST GRAND AVENUE, ELMHURST, IL 60126, 630-834-8000) WHERE IT WAS DIAGNOSED THAT THE ENGINE OIL WAS LOW. *THE DEALER STATED THAT* THE ENGINE OIL MIGHT BE RELEASING THROUGH THE EXHAUST SYSTEM AND THAT *THE 2.4 LITER ENGINE WAS KNOWN TO BE FAULTY*. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE CONTACT WAS CONCERNED THAT THE ENGINE MAY STALL IN TRAFFIC ON THE HIGHWAY. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 43,600. May 15, 2018, NHTSA complaint.

- THE VEHICLE SHUT OFF ON MY WIFE AND CHILD WHILE SHE WAS DRIVING IT ON THE HIGHWAY, AND *WE TOOK IT TO THE DEALERSHIP AND THEY SAID* IT WAS LOW ON OIL AND THEY DID AN OIL CONSUMPTION TEST AND CLEARED THE VEHICLE AND SAID *IT WAS A COMMON PROBLEM* AND THEY HAVE TO DO OIL CONSUMPTION TEST BEFORE CHRYSLER WILL ISSUE A REPLACEMENT MOTOR, AFTER 2 MONTHS OF THE TEST THEY CONCLUDED THAT IT WAS OK AND SAFE TO DRIVE. THE ISSUE HAPPEND AGAIN WITH MY WIFE AND CHILD IN THE CAR AND DRIVING DOWN THE ROAD, SHE MADE IT BACK HOME AND THE MOTOR WAS OUT OF OIL 3,000 MILES BEFORE HER NEXT OIL CHANGE. I GOT IT TO THE DEALER AND THEY SAID THEY HAVE TO DO THE OIL CONSUMPTION TEST PROCESS AGAIN. May 16, 2018, NHTSA complaint.

- AROUND 8:50AM OCTOBER 4TH, 2018 MY WIFE AND BABY WERE AT A CITY STREET RED LIGHT STOPPED AND UPON

- 69 -

ACCELERATING THE CAR COMPLETELY SHUT OFF AND THE STEERING-WHEEL LOCKED UP. AFTER ABOUT 5 MINUTES SHE WAS ABLE TO START IT UP AGAIN. WE LIVE IN THE CITY SO THIS COULD HAVE BEEN MUCH WORSE AT ANY DIFFERENT LIGHT AT ANY TIME OF DAY. I BROUGHT IT IN FIRST THING THE NEXT MORNING TO THE DEALERSHIP AND WAS TOLD THAT LOW OIL CAN CAUSE AIRPOCKETS IN THE ENGINE SHUTTING THE WHOLE VEHICLE OFF. ***THE JEEP TECH SAID "THIS HAS BEEN SEEN A LOT ON NEWER JEEPS IN THESE MULTI-AIR ENGINES. PEOPLE COME IN FOR THE SAME REASON AND HAVE NO INDICATION OF WHAT CAUSED IT. WHEN THEY FIRST CAME OUT WE HAD TO DIAGNOSE A LOT AND 99.9% OF THE TIME THAT IS THE CAUSE."*** MY CAR WAS AT ~11,200 MILES, AND MY OIL CHANGE STICKER SUGGESTED ~11,600 TO GET IT CHANGED AGAIN. I HAD NO OIL LIGHT, LET ALONE WASN'T EVEN CLOSE TO THE CERTIFIED TECH'S OIL CHANGE STICKER THAT IS PLACED ON THE CAR. THIS IS COMPLETELY UNSAFE AND NOT ACCEPTABLE. THE TECH SUGGESTED KEEPING A QUART OF OIL IN MY CAR AND CHECKING THE OIL EVERY 1-2K MILES (IN A BRAND NEW VEHICLE!)…. October 15, 2018, NHTSA complaint for 2017 Jeep Compass.

- STARTING AT 25K MILES, THE VEHICLE STARTED TO BURN THROUGH OIL EVEN BEFORE THE NEXT OIL CHANGE. THE MANUAL STATES TO GO OFF THE OIL SYSTEM LIGHT, DEALERS SAY DIFFERENT. OIL HAD 14% LEFT, BUT THE CAR KEPT SHUTTING OFF WHILE DRIVING ON THE HIGHWAY. WENT TO DEALER, CAR BURNED THROUGH ALL THE OIL. THEY REFUSED TO CHECK FOR ENGINE DAMAGE AND FORCE ME TO PAY FOR A FULL OIL CHANGE. ***STATED BY THE DEALER, ITS A KNOWN ISSUE WITH JEEP.*** October 9, 2019, NHTSA complaint.

- THE VEHICLE SHUTS OFF WHEN APPROACHING 3500 MILES. THIS HAPPENS WHEN THE VEHICLE IS IN MOTION REGARDLESS OF SPEED RENDERING THE VEHICLE EXTREMELY DIFFICULT TO MANEUVER. ***THE JEEP WAS TAKEN TO DEALER AND THE MECHANIC ADVISED THAT***

- 70 -

***THIS IS A KNOWN ISSUE*** WITH SOME OF THE NEW JEEP CHEROKEES CONTAINING CERTAIN FIAT MOTORS. THE VEHICLES NOW HAVE A FIAT MOTOR THAT APPARENTLY BURNS THE ENGINES OIL EVERY 3500 MILES & THE SHUT OFF IS A BUILT IN "SAFETY MECHANISM" TO PREVENT THE MOTOR FROM BURNING OUT DUE TO THE LACK OF OIL. THIS INFORMATION WAS NOT DISCLOSED WHEN THE VEHICLE WAS PURCHASED. December 29, 2018, NHTSA complaint.

- MY NEW CAR HAS 2,800 MILES DUE FOR AN OIL CHANGE AT 5 MONTHS/5,000 MILES. THE ENGINE FAILED ONCE FOR NO KNOWN CAUSE AFTER 2 WEEKS IN THE REPAIR SHOP. NOW MY CAR DIED WHILE IN MOTION ON BUSY ROADS AND A HIGHWAY RAMP AT SPEEDS BETWEEN 15-40 MPH WITHOUT WARNING OR LIGHTS. THIS IS SLA SAFETY HAZARD AS THE STEERING GOES AND CAR JUST COMES TO A STOP WITHOUT ANY WARNING. I HAD IT TOWED AFTER IT'S 5TH TIME IN 4 DAYS STOPPING WHILE IN MOTION AND SHUTTING DOWN. JEEP TOLD ME IT'S EMPTY ON OIL BUT YET THE OIL LIGHT INDICATOR DOESN'T COME ON. ***THEY SAID IT IS A KNOWN ISSUE WITHOUT A FIX FOR ALL 2014-2019 JEEP CHEROKEES***. September 26, 2018, NHTSA complaint.

- WHILE DRIVING A VEHICLE WITH ONLY 4200 MILES ON IT, THE JEEP STALED WITHOUT WARNING. JEEP RESTARTED AND WAS DRIVEN. WHEN I CALLED THE LOCAL DEALERSHIP, I WAS INFORMED TO CHECK MY OIL LEVEL - THAT IT WOULD BE LOW AND TO REFILL. I ASKED HOW THEY KNOW THIS AND ***THE DEALERSHIP'S SERVICE CENTER INFORMED ME THAT THIS IS A "KNOWN ISSUE" WITH THE 2.4 LITER ENGINE AND IS "COMMON"***. I CHECKED MY OIL, SURE ENOUGH, IT WAS LOW - I WOULD SAY TWO (2) QUARTS LOW (IN A 5 QUART SYSTEM). NO "CHECK ENGINE LIGHT", NO "SERVICE ISSUE ANNOUNCEMENT" FROM JEEP - NO WARNING AT ALL FOR A "KNOWN ISSUE". THIS IS INEXCUSABLE! August 9, 2018, NHTSA complaint.

- 71 -

- WHILE DRIVING THE JEEP COMPASSM WITH LESS THAN 5K MILES, THE CAR SHUT OFF WHILE I WAS GOING ABOUT 35 MPH WITHOUT WARNING AND LOCKED THE STEERING AND EVERYTHING. I TOOK IT TO THE JEEP DEALER AND WITHOUT HESITATION, THEY KNEW THAT IT NEEDED A BRAND NEW ENGINE BECAUSE THE CAR "SHOULD NOT BE BURNING OIL THIS QUICKLY." THEY MADE IT SEEM AS THOUGH THIS OCCURS EXTREMELY FREQUENTLY AND I HAVE READ SEVERAL FORUMS ABOUT PEOPLE HAVING THE SAME ISSUE JUST BY LOOKING UP "JEEP COMPASS BURNING OIL." THIS IS AN EXTREMELY HAZARDOUS SITUATION AND SHOULD BE ADDRESSED IMMEDIATELY. *DT

  CONSUMER STATED DEALER TOLD HIM RINGS AND PISTONS IN THE ENGINE AND THAT THE OLD ENGINE WAS BURNING A CRAZY AMOUNT OF OIL ENGINE WAS BURNING A TREMENDOUS AMOUNT OF OIL, ***DEALER HINTED THAT A RECALL MAY HAPPEN BECAUSE HOW COMMON THE PROBLEM WAS***.*JB April 2, 2019.

102.   Before dealers would have been referring to the Oil Consumption and Oil Indicator defects as "common" and "known" problems, FCA certainly would have been aware of them. And the pervasiveness of the defects increases the likelihood of FCA's early knowledge. For example, a November 30, 2019 NHTSA complaint states that one dealer said it "had 50 customers" with the same problem. And a consumer forum posting on carproblemzoo.com states that the dealer "said its normal to burn oil and FCA knows about the issue but will not repair. They say about 70% of the 2. 4 are affected across all models."

- 72 -

E.      **FCA has exclusive knowledge of the defects.**

103.   FCA had superior and exclusive knowledge of the defects and knew
or should have known that the defects were not known or reasonably discoverable
by Plaintiffs and class members before they purchased or leased the Class
Vehicles.

104.   Before Plaintiffs purchased their Class Vehicle, and since at least
2015, FCA knew about the defects through its exclusive knowledge of non-public,
internal data including pre-and post-release internal durability testing and analysis;
early consumer complaints about the defects, including complaints to Defendant's
dealers who are its agents for vehicle repairs; records from NHTSA, including
early customer complaints made to NHTSA and elsewhere; dealership repair
orders; testing conducted in response to those complaints; and other various
sources.

105.   The Oil Consumption and Oil Indicator defects were inherent in each
Class Vehicle and present at the time of sale.

106.   The existence of the defects is a material fact that a reasonable
consumer would consider when deciding whether to purchase or lease a vehicle.
Had Plaintiffs and other class members known that the Class Vehicles were
equipped with an engine that causes excessive oil consumption and shuts off

- 73 -

without warning, they would not have purchased or leased the Class Vehicles or would have paid less for them.

107.   Reasonable consumers, like Plaintiffs, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiffs and class members further reasonably expect that FCA will not sell or lease vehicles with known safety defects, such as the Oil Consumption and Oil Indicator defects, and will disclose any such defects to its consumers when it learns of them. Plaintiffs and class members did not expect FCA to fail to disclose the Oil Consumption and Oil Indicator defects to them and to continually deny the defects by refusing to issue a recall.

**F.     FCA has actively concealed the defects.**

108.   While FCA has been fully aware of the defects in the Class Vehicles, it actively concealed the existence and nature of them from Plaintiffs and class members at the time of purchase, lease, or repair and thereafter.

109.   FCA—by and through the statements it made in the Owner's Manuals prepared for distribution with the Class Vehicles—has misrepresented the Oil Consumption defect by recommending oil changes at much higher mileage than warranted by the true oil life cycle of the Class Vehicles, and has misrepresented the Oil Indicator defect by saying that an oil change indicator will let the driver know the appropriate time to change the oil, when Class Vehicles may actually

- 74 -

require an oil change much sooner than indicated and receive no warning prior to the Class Vehicle shutting off to avoid engine damage.

110. According to FCA's representations in the Owner's Manual: "Severe Operating Conditions can cause the change oil message to illuminate as early as 3,500 miles since last reset." But FCA made far different representations in the TSB Oil Consumption Guidelines issued to its dealers in 2015.

111. In the 2015 TSB, FCA told dealer service departments that the accepted rate of oil consumption for engines used in its vehicles is one quart/per 2,000 miles driven for the first 50,000 miles. And for vehicles with more than 50,000 miles, the acceptable oil consumption is one quart for every 750 miles.

112. FCA entirely omits the information contained in its 2015 TSB Oil Consumption Guidelines from the Owner's Manual it distributes with the Class Vehicles. Moreover, FCA fails to disclose to consumers the information in its 2015 Oil Consumption Guidelines when they purchase the Class Vehicles. Plaintiffs and class members thus only learn that FCA considers the excessive oil consumption of the 2.4L Tigershark engine "normal" when they are told that is the case by FCA's service departments. Conveniently for FCA, this occurs far after the sale of the Class Vehicles and after experiencing the consequences of the defects.

- 75 -

113.   To the extent that FCA believed that the Oil Consumption defect is "normal," it had a duty to disclose that information to consumers because of the partial representations made in the Owner's Manuals of the Class Vehicles.

114.   Moreover, despite notice of the defect from numerous consumer complaints and dealership repair orders, FCA has not recalled the Class Vehicles to repair the defects, has not offered their customers a suitable repair or replacement free of charge, and has not offered to reimburse the Class Vehicles' owners and leaseholders in full for the costs they incurred in attempting to diagnose and repair the defects.

115.   When consumers present the Class Vehicles to an authorized FCA dealer for stalling, consumers are typically told the excessive oil consumption and frequent "top-offs" of engine oil are a known issue and there is no fix. On information and belief, whether or not consumers are forced to pay for repairs relating to excessive oil consumption and subsequent engine damage, the same defective part or parts are used to replace the prior defective part or parts.

116.   To this day, FCA still has not notified Plaintiffs and class members that the Class Vehicles suffer from systemic defects that cause excessive oil consumption and premature engine damage and wear.

117.   On information and belief, FCA has caused Plaintiffs and class members to expend money at its dealerships to diagnose, repair, and/or replace the

- 76 -

Class Vehicles' engine or related components, despite FCA's knowledge of the defects.

## G.   The statute of limitations should be tolled.

118.   Because the defects in the design or manufacture of the Class Vehicles and their engines and/or related components cannot be detected until the defects manifests themselves, Plaintiffs and class members were not reasonably able to discover the problem until after purchasing or leasing the Class Vehicles, despite their exercise of due diligence.

119.   Plaintiffs and class members had no realistic ability to discern that the engine was defective until it prematurely failed, and would have no reason to believe that problems they encountered were caused by dangerous defects known to FCA. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and class members.

120.   Plaintiffs are informed and believe and based thereon allege that FCA knew of the defects since 2015, if not earlier, and has concealed from or failed to alert owners and lessees of the Class Vehicles of the defective nature of their vehicles.

121.   Any applicable statute of limitation has therefore been tolled by FCA's knowledge, active concealment, and denial of the facts alleged herein. FCA

- 77 -

is further estopped from relying on any statute of limitation because of its

concealment of the defective nature of the Class Vehicles and their engines.

## V.    CLASS ACTION ALLEGATIONS

122.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

and all others similarly situated as members of the proposed Plaintiff Classes

pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This

action satisfies the numerosity, commonality, typicality, adequacy, predominance,

and superiority requirements of those provisions.

123.   The Classes are defined as:

> All individuals in [State] who purchased or leased any
> FCA vehicle equipped with the 2.4L Tigershark MultiAir
> II engine.

124.   Excluded from the Classes are: (1) Defendant, any entity or division

in which Defendant has a controlling interest, and their legal representatives,

officers, directors, assigns, and successors; (2) the Judge to whom this case is

assigned and the Judge's staff; (3) any Judge sitting in the presiding court system

who may hear an appeal of any judgment entered; and (4) those persons who have

suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve

the right to amend the Class definitions if discovery and further investigation

reveal that the Classes should be expanded or otherwise modified.

125.    There is a well-defined community of interest in the litigation and each subclass is readily ascertainable.

126.    <u>Numerosity:</u> Although the exact number of class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of class members' claims in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the departments of motor vehicles of the various states.

127.    <u>Typicality:</u> The claims of the representative Plaintiffs are typical of the claims of all class members in that the representative Plaintiffs and class members purchased and/or leased a Class Vehicle designed, manufactured, and distributed by FCA. The representative plaintiffs, like all class members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of substantial oil additions and engine repairs caused by excessive oil consumption. Furthermore, the factual bases of FCA's misconduct are common to all class members and represent a common thread resulting in injury to all class members.

128.    <u>Commonality and Predominance:</u> There are numerous questions of law and fact common to Plaintiffs and class members that predominate over any

question affecting individual class members. These common legal and factual

issues include the following:

> (a)   Whether Class Vehicles contain engine defects
>        causing excessive oil consumption and sudden shut
>        off without warning;
>
> (b)   Whether Defendant knew about the defects
>        relating to the Class Vehicles;
>
> (c)   Whether Defendant had a duty to disclose the
>        defects to Plaintiffs and class members;
>
> (d)   Whether Defendant failed to disclose the defects;
>
> (e)   Whether Defendant's omission of the defects was
>        material; and
>
> (f)   Whether Plaintiffs and class members are entitled
>        to compensatory and/or equitable relief.

129.   <u>Adequate Representation:</u> Plaintiffs will fairly and adequately protect

class members' interests. Plaintiffs have retained attorneys experienced in

prosecuting class actions, including consumer and product defect class actions, and

Plaintiffs intend to prosecute this action vigorously.

130.   <u>Superiority:</u> Plaintiffs and class members have all suffered and will

continue to suffer harm and damages as a result of Defendant's unlawful and

wrongful conduct. A class action is superior to other available methods for the fair

and efficient adjudication of the controversy. Absent a class action, most class

members would likely find the cost of litigating their claims prohibitively high and

would therefore have no effective remedy at law. Because of the relatively small

- 80 -

size of the individual class members' claims, it is likely that only a few class

members could afford to seek legal redress for Defendant's misconduct. Absent a

class action, class members will continue to incur damages, and Defendant's

misconduct will continue without remedy. Class treatment of common questions of

law and fact would also be a superior method to multiple individual actions or

piecemeal litigation in that class treatment will conserve the resources of the courts

and the litigants and will promote consistency and efficiency of adjudication.

## COUNT I

### VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201 *ET SEQ.*)

131.    Plaintiffs incorporate by reference all paragraphs as though fully set

forth herein.

132.    Plaintiffs bring this Count on behalf of the Florida class members.

133.    Plaintiffs and class members are "consumers" within the meaning of

the Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA"), Fla.

Stat. § 501.203(7).

134.    Defendant engaged in "trade or commerce" within the meaning of Fla.

Stat. § 501.203(8).

135.    Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair

methods of competition, unconscionable acts or practices, and unfair or deceptive

- 81 -

acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

Defendant participated in unfair and deceptive trade practices that violated the

Florida UDTPA as described herein.

136.   In the course of FCA's business, FCA willfully failed to disclose and

actively concealed that the Oil Consumption defect in the Class Vehicles causes

them to consume so much oil that they become low in between recommended oil

changes resulting in the sudden shut off of the Class Vehicles to protect the engine

at the expense of vehicle occupant safety. Moreover, FCA willfully failed to

disclose and actively concealed that the Class Vehicles fail to warn consumers of

the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they

have no opportunity to avert sudden shut off. Particularly in light of the

representations in FCA's Owner's Manual, and in its national advertising

campaign touting the safety and reliability of the Class Vehicles, a reasonable

American consumer would expect the Class Vehicles to operate without known

safety hazards. Accordingly, FCA engaged in unfair and deceptive trade practices,

unfair methods of competition, unconscionable acts or practices, and unfair or

deceptive acts or practices. FCA's acts had the capacity, tendency or effect of

deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any

- 82 -

material fact with the intent that a consumer rely on the same in connection
therewith.

137.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other
class members were deceived by FCA's failure to disclose that the Oil
Consumption defect in the Class Vehicles causes them to consume so much oil that
they become low in between recommended oil changes resulting in the sudden shut
off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively
concealed that the Class Vehicles fail to warn consumers of the low oil levels
and/or pressure, such that consumers have no opportunity to avert sudden shut off.

138.   Plaintiffs and class members reasonably relied upon FCA's
misrepresentations, and had no way of knowing that said representations were false
and gravely misleading. As alleged herein, FCA engaged in sophisticated methods
of deception. Plaintiffs and class members did not, and could not, unravel FCA's
deception on their own, as FCA engaged in a deliberately misleading campaign to
describe in its TSB and otherwise that the excessive oil consumption was "normal"
even though it caused Class Vehicles to run low on oil *in between* recommended
oil changes. Plaintiffs and other class members were not aware of this defect prior
to purchase or lease.

139.   FCA's actions as set forth above occurred in the conduct of trade or
commerce.

140.   FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

141.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

142.   FCA knew or should have known that its conduct violated the Florida UDTPA.

143.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.   Possessed superior/exclusive knowledge of the design of the Class Vehicles;

    b.   Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.   Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

144.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive

- 84 -

oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

145.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

146.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

147.   Plaintiffs and class members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

148.   Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Florida UDTPA.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON FLORIDA LAW)

149.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

150.   Plaintiffs bring this Count on behalf of the Florida Class.

151.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

152.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

153.   FCA had a duty to disclose this material safety information to Plaintiffs and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

- 86 -

154.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

155.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

156.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

157.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

158.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT III

### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*)

159.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 87 -

160.   Plaintiffs bring this Count on behalf of the Missouri class members.

161.   Defendant, Plaintiffs and class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

162.   Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

163.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

164.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable

- 88 -

American consumer would expect the Class Vehicles to operate without known

safety hazards. Accordingly, FCA engaged in unfair and deceptive trade practices,

unfair methods of competition, unconscionable acts or practices, and unfair or

deceptive acts or practices. FCA's acts had the capacity, tendency or effect of

deceiving or misleading consumers; failed to state a material fact that deceives or

tends to deceive; and constitute deception, fraud, false pretense, false promise,

misrepresentation, or knowing concealment, suppression, or omission of any

material fact with the intent that a consumer rely on the same in connection

therewith.

165. In purchasing or leasing the Class Vehicles, Plaintiffs and the other

class members were deceived by FCA's failure to disclose that the Oil

Consumption defect in the Class Vehicles causes them to consume so much oil that

they become low in between recommended oil changes resulting in the sudden shut

off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively

concealed that the Class Vehicles fail to warn consumers of the low oil levels

and/or pressure, such that consumers have no opportunity to avert sudden shut off.

166. Plaintiffs and class members reasonably relied upon FCA's

misrepresentations, and had no way of knowing that said representations were false

and gravely misleading. As alleged herein, FCA engaged in sophisticated methods

of deception. Plaintiffs and class members did not, and could not, unravel FCA's

deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Class Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

167. FCA's actions as set forth above occurred in the conduct of trade or commerce.

168. FCA's methods of competition and unfair, deceptive acts were likely to and did in fact deceive reasonable consumers.

169. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

170. FCA knew or should have known that its conduct violated the Missouri MPA.

171. FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.   Possessed superior/exclusive knowledge of the design of the Class Vehicles;

    b.   Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while

- 90 -

purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

172.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

173.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

174.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

175.   FCA is liable to Plaintiffs and the class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining FCA's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT IV

## FRAUDULENT CONCEALMENT
## (BASED ON MISSOURI LAW)

176.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

177.   Plaintiffs bring this Count on behalf of the Missouri Class.

178.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

179.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

- 92 -

180. FCA had a duty to disclose this material safety information to Plaintiffs and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

181. FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

182. FCA intentionally engaged in deception in order to sell the Class Vehicles.

183. Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

184. As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

185. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT V

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### (NEV. REV. STAT. § 598.0903 *ET SEQ.*)

186.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

187.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person "[k]nowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "[r]epresents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "[a]dvertises goods or services with intent not to sell or lease them as advertised"; or "[k]nowingly makes any other false representation in a transaction." Nev. Rev. Stat. §§ 598.0915–598.0925.

188.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil

- 94 -

changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards. Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material

- 95 -

fact that deceives or tends to deceive; and constitute deception, fraud, false

pretense, false promise, misrepresentation, or knowing concealment, suppression,

or omission of any material fact with the intent that a consumer rely on the same in

connection with the Class Vehicles.

189.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other

class members were deceived by FCA's failure to disclose that the Oil

Consumption defect in the Class Vehicles causes them to consume so much oil that

they become low in between recommended oil changes resulting in the sudden shut

off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively

concealed that the Class Vehicles fail to warn consumers of the low oil levels

and/or pressure, such that consumers have no opportunity to avert sudden shut off.

190.   Plaintiffs and class members reasonably relied upon FCA's

misrepresentations, and had no way of knowing that said representations were false

and gravely misleading. As alleged herein, FCA engaged in sophisticated methods

of deception. Plaintiffs and class members did not, and could not, unravel FCA's

deception on their own, as FCA engaged in a deliberately misleading campaign to

describe in its TSB and otherwise that the excessive oil consumption was "normal"

even though it caused Class Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior

to purchase or lease.

- 96 -

191.   FCA knew at the time of the consumer transactions that the Plaintiffs and other class members would not receive a substantial benefit from their acquisitions of the Class Vehicles.

192.   FCA's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

193.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

194.   FCA knew or should have known that its conduct violated the Nevada DTPA.

195.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Class Vehicles;

b.   Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

- 97 -

c.     Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

196.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

197.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

- 98 -

198.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

199.   Accordingly, Plaintiffs seek actual damages, punitive damages, an order enjoining FCA's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. Nev. Rev. Stat. § 41.600.

**COUNT VI**

**FRAUDULENT CONCEALMENT
(BASED ON NEVADA LAW)**

200.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

201.   Plaintiffs bring this Count on behalf of the Nevada Class.

202.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

203.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

- 99 -

204.    FCA had a duty to disclose this material safety information to Plaintiffs and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

205.    FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

206.    FCA intentionally engaged in deception in order to sell the Class Vehicles.

207.    Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

208.    As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

209.    FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT VII

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
## (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*)

210.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

211.    Defendant, Plaintiffs, and class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

212.    Defendant engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

213.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. § 56:8-2.

214.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil

- 101 -

changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards. Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material

- 102 -

fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles.

215.    In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

216.    Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Class Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

- 103 -

217.   FCA knew at the time of the consumer transactions that the Plaintiffs and other class members would not receive a substantial benefit from their acquisitions of the Class Vehicles.

218.   FCA's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

219.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

220.   FCA knew or should have known that its conduct violated the New Jersey CFA.

221.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.     Possessed superior/exclusive knowledge of the design of the Class Vehicles;

b.     Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

- 104 -

       c.     Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

222.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

223.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

- 105 -

224.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

225.   Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining FCA's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT VIII

### FRAUDULENT CONCEALMENT
### (BASED ON NEW JERSEY LAW)

226.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

227.   Plaintiffs bring this Count on behalf of the New Jersey Class.

228.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

229.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

230.   FCA had a duty to disclose this material safety information to Plaintiffs and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

231.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

232.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

233.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

234.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

235.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT IX

### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*)

236.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

237.    Plaintiffs bring this Count behalf of the Ohio class members.

238.    FCA's actions occurred in the conduct of trade or commerce.

239.    Plaintiffs and the other Ohio class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("Ohio CSPA").

240.    FCA is a "supplier" as defined by the Ohio CSPA.

241.    Plaintiffs' and the other Ohio class members' purchases or leases of Class Vehicles were "consumer transactions" as defined by the Ohio CSPA.

242.    The Ohio CSPA, Ohio Rev. Code § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code § 1345.02. Defendant's conduct as alleged above and below constitutes

- 108 -

unfair and unconscionable acts or practices in consumer sales transactions in violation of Ohio Rev. Code § 1345.02. By concealing the known defects in the Class Vehicles, FCA participated in unconscionable acts and practices that violated the Ohio CSPA.

243.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of GM in this Complaint, including but not limited to the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.   *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g.   *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

- 109 -

    h.    *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

    i.    *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

    j.    *Khouri v. Don Lewis* (OPIF #100001995);

    k.    *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

    l.    *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

    m.    *Brown v. Spears* (OPIF #10000403).

244.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards. Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices,

including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles.

245.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively

concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

246.   Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Class Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

247.   FCA knew at the time of the consumer transactions that the Plaintiffs and other class members would not receive a substantial benefit from their acquisitions of the Class Vehicles.

248.   FCA's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

249.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

- 112 -

250.   FCA knew or should have known that its conduct violated the Ohio CSPA.

251.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Class Vehicles;

b.   Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.   Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

252.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off.

- 113 -

This is a reasonable and objective consumer expectation relating to the Class Vehicles.

253. Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

254. FCA's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

255. Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining FCA's deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendant's violations of the Ohio CSPA as provided in Ohio Rev. Code § 1345.09.

## COUNT X

## FRAUDULENT CONCEALMENT
## (BASED ON OHIO LAW)

256. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 114 -

257.   Plaintiffs bring this Count on behalf of the Ohio Class.

258.   FCA intentionally misrepresented and concealed the above-described

material safety information, or acted with reckless disregard for the truth, and

denied Plaintiffs and class members information that is highly relevant to their

purchasing decision.

259.   The vehicles Plaintiffs and class members purchased or leased were,

in fact, defective, unsafe and unreliable, because they were subject to stalling or

shutting down even while the vehicle was in operation, at normal driving speeds.

260.   FCA had a duty to disclose this material safety information to

Plaintiffs and members of the class because of the safety hazards posed by the

alleged defects and based on its representations to the contrary.

261.   FCA's concealment was material because if it had been disclosed,

Plaintiffs and class members would not have bought or leased the Class Vehicles

or paid as much for them.

262.   FCA intentionally engaged in deception in order to sell the Class

Vehicles.

263.   Plaintiffs and class members relied on FCA's reputation as an

automaker—along with FCA's omission of the defects in the Class Vehicles and

FCA's affirmative assurance that its vehicles were safe and reliable and other

similar false statements—when they purchased or leased the Class Vehicles.

- 115 -

264. As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

265. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT XI

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT (TENN. CODE ANN. 47-18-101 *ET SEQ.*)

266. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

267. Plaintiffs bring this Count on behalf of the Tennessee class members.

268. Plaintiffs and the Tennessee Class are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). Defendant is a "person" within the meaning of Tenn. Code § 47-18-103(9).

269. Defendant is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

270. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.

- 116 -

271.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards. Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and

- 117 -

failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles.

272.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

273.   Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal"

even though it caused Class Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

274.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

275.   FCA knew or should have known that its conduct violated the Tennessee CPA.

276.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

    a.    Possessed superior/exclusive knowledge of the design of the Class Vehicles;

    b.    Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

    c.    Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

277.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not

- 119 -

expect the engines installed in their vehicles to exhibit problems such as excessive

oil consumption causing sudden shut off, as well as premature engine wear,

damage, and failure. This is a reasonable and objective consumer expectation

relating to vehicle engines. Nor do reasonable consumers expect that their vehicles

will fail to warn them in time to avoid dangerously low oil and sudden shut off.

This is a reasonable and objective consumer expectation relating to the Class

Vehicles.

278.   Plaintiffs and the other class members were injured and suffered

ascertainable loss, injury in fact, and/or actual damage as a proximate result of

FCA's conduct in that Plaintiffs and the other class members overpaid for their

Class Vehicles and did not receive the benefit of their bargain, and their Class

Vehicles have suffered a diminution in value. These injuries are the direct and

natural consequence of FCA's misrepresentations, fraud, deceptive practices, and

omissions.

279.   FCA's violations present a continuing risk to Plaintiffs as well as to

the general public. Defendant's unlawful acts and practices complained of herein

affect the public interest.

280.   Pursuant to Tenn. Code § 47-18-109, Plaintiffs and the Tennessee

Class seek an order enjoining FCA's unfair and/or deceptive acts or practices,

damages, treble damages for willful and knowing violations, pursuant to § 47-18-

109(a)(3), punitive damages, and attorneys' fees, costs, and any other just and

proper relief to the extent available under the Tennessee CPA.

## COUNT XII

## FRAUDULENT CONCEALMENT
## (BASED ON TENNESSEE LAW)

281.   Plaintiffs incorporate by reference all paragraphs as though fully set

forth herein.

282.   Plaintiffs bring this Count on behalf of the Tennessee Class.

283.   FCA intentionally misrepresented and concealed the above-described

material safety information, or acted with reckless disregard for the truth, and

denied Plaintiffs and class members information that is highly relevant to their

purchasing decision.

284.   The vehicles Plaintiffs and class members purchased or leased were,

in fact, defective, unsafe and unreliable, because they were subject to stalling or

shutting down even while the vehicle was in operation, at normal driving speeds.

285.   FCA had a duty to disclose this material safety information to

Plaintiffs and members of the class because of the safety hazards posed by the

alleged defects and based on its representations to the contrary.

286.   FCA's concealment was material because if it had been disclosed,

Plaintiffs and class members would not have bought or leased the Class Vehicles

or paid as much for them.

- 121 -

287.   FCA intentionally engaged in deception in order to sell the Class

Vehicles.

288.   Plaintiffs and class members relied on FCA's reputation as an

automaker—along with FCA's omission of the defects in the Class Vehicles and

FCA's affirmative assurance that its vehicles were safe and reliable and other

similar false statements—when they purchased or leased the Class Vehicles.

289.   As a result of their reliance, Plaintiffs and class members have been

injured in an amount to be proven at trial, including, but not limited to, their lost

benefit of the bargain and overpayment at the time of purchase and/or the

diminished value of the Class Vehicles.

290.   FCA's conduct was knowing, intentional, with malice, demonstrated a

complete lack of care, and was in reckless disregard for the rights of Plaintiffs and

class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT XIII

## VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT – CONSUMER PROTECTION ACT
## (TEX. BUS & COM. CODE § 17.41 *ET SEQ.*)

291.   Plaintiffs incorporate by reference all paragraphs as though fully set

forth herein.

- 122 -

292.   This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of the Texas Class.

293.   Plaintiffs and the Texas Class are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4). Defendant is a "person" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

294.   Defendant is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

295.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

296.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes

- 123 -

them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards. Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. FCA's acts had the capacity,

- 124 -

tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles.

297.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

298.   Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Class Vehicles to run low on oil *in between* recommended

oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

299.   FCA knew at the time of the consumer transactions that the Plaintiffs and other class members would not receive a substantial benefit from their acquisitions of the Class Vehicles.

300.   FCA's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

301.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

302.   FCA knew or should have known that its conduct violated the Texas DTPA.

303.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

     a.     Possessed superior/exclusive knowledge of the design of the Class Vehicles;

     b.     Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully

- 126 -

withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

     c.    Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

304.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

305.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

306.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public; indeed, the unlawful acts and practices complained of herein affect the public interest.

307.   Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), once the notice period expires, Plaintiffs will amend to seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages for FCA's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

308.   Alternatively, or additionally, pursuant to Tex. Bus. & Com. Code § 17.50(b)(3) & (4), Plaintiffs are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

309.   On April 30, 2020, Plaintiffs sent a letter complying with Tex. Bus. & Com. Code Ann. § 17.505 to Defendant. This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of residents of Texas who are members of the class.

- 128 -

## COUNT XIV

## FRAUDULENT CONCEALMENT
## (BASED ON TEXAS LAW)

310.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

311.   Plaintiffs bring this Count on behalf of the Texas Class.

312.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

313.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

314.   FCA had a duty to disclose this material safety information to Plaintiffs and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

315.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

316.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

- 129 -

317.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

318.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

319.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT XI

## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*)

320.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

321.   Plaintiffs bring this Count on behalf of the Virginia class members.

322.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices," which include "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

- 130 -

323.    Defendant is a "supplier" under Va. Code Ann. § 59.1-198.

324.    Each sale and lease of an Affected Vehicle was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

325.    In the course of FCA's business, FCA willfully failed to disclose and actively concealed that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles to protect the engine at the expense of vehicle occupant safety. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure—i.e., the Oil Indicator defect—such that they have no opportunity to avert sudden shut off. Particularly in light of the representations in FCA's Owner's Manual, and in its national advertising campaign touting the safety and reliability of the Class Vehicles, a reasonable American consumer would expect the Class Vehicles to operate without known safety hazards. Accordingly, FCA engaged in unlawful, unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact

- 131 -

could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner. FCA's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the Class Vehicles.

326.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other class members were deceived by FCA's failure to disclose that the Oil Consumption defect in the Class Vehicles causes them to consume so much oil that they become low in between recommended oil changes resulting in the sudden shut off of the Class Vehicles. Moreover, FCA willfully failed to disclose and actively concealed that the Class Vehicles fail to warn consumers of the low oil levels and/or pressure, such that consumers have no opportunity to avert sudden shut off.

327.   Plaintiffs and class members reasonably relied upon FCA's misrepresentations, and had no way of knowing that said representations were false and gravely misleading. As alleged herein, FCA engaged in sophisticated methods

of deception. Plaintiffs and class members did not, and could not, unravel FCA's deception on their own, as FCA engaged in a deliberately misleading campaign to describe in its TSB and otherwise that the excessive oil consumption was "normal" even though it caused Class Vehicles to run low on oil *in between* recommended oil changes. Plaintiffs and other class members were not aware of this defect prior to purchase or lease.

328.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the Class.

329.   FCA knew or should have known that its conduct violated the Virginia CPL.

330.   FCA owed Plaintiffs and the Class a duty to disclose the truth regarding the Oil Consumption and Oil Indicator defects because the defects affect the safety of the vehicles and/or because FCA:

a.   Possessed superior/exclusive knowledge of the design of the Class Vehicles;

b.   Made incomplete representations regarding the operation, as well as the safety and durability, of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations; and/or

c.     Intentionally concealed the Oil Consumption and Oil Indicator defects from Plaintiffs and the Class.

331.   FCA's conduct proximately caused injuries to Plaintiffs and the other class members. Plaintiffs and class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as excessive oil consumption causing sudden shut off, as well as premature engine wear, damage, and failure. This is a reasonable and objective consumer expectation relating to vehicle engines. Nor do reasonable consumers expect that their vehicles will fail to warn them in time to avoid dangerously low oil and sudden shut off. This is a reasonable and objective consumer expectation relating to the Class Vehicles.

332.   Plaintiffs and the other class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the other class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations, fraud, deceptive practices, and omissions.

- 134 -

333.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

334.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because Defendant's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

## COUNT XIV

### FRAUDULENT CONCEALMENT
### (BASED ON VIRGINIA LAW)

335.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

336.   Plaintiffs bring this Count on behalf of the Virginia Class.

337.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

338. The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

339. FCA had a duty to disclose this material safety information to Plaintiffs and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

340. FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

341. FCA intentionally engaged in deception in order to sell the Class Vehicles.

342. Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

343. As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

344.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT XV

## VIOLATIONS OF STATE CONSUMER PROTECTION ACTS

345.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

346.   This Count is brought by Plaintiffs, individually and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts including:[1]

   a.   the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471 *et seq.*;

   b.   the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 *et seq.*;

   c.   the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101 *et seq.*;

   d.   the California Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.* and 17500 *et seq.*;

---

[1] Plaintiffs also place Defendant on notice that they intend to amend their complaint to seek recovery for class members under the following statutes: Alabama Code § 8-19-10(e); Alaska Statutes § 45.50.535; California Civil Code § 1782; Georgia Code § 10-1-399; Indiana Code § 24-5-0.5-5(a); Maine Revised Statutes, Title 5 § 50-634(g); Massachusetts General Laws Chapter 93A, § 9(3); West Virginia Code § 46A-6-106(b); and Wyoming Statutes § 40-12-109.

- 137 -

e.      the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*;

f.      the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101 *et seq.*;

g.      the Connecticut Unfair Trade Practices Act, Conn. Gen Stat. Ann. § 42-110 *et seq.*;

h.      the Delaware Consumer Fraud Act, 6 Del. Code § 2513 *et seq.*;

i.      the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq.*;

j.      the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 *et seq.*;

k.      the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390 *et seq.*;

l.      the Hawaii Unfair Competition Law, Haw. Rev. Stat. § 480-2 *et seq.*;

m.      the Idaho Consumer Protection Act, Idaho Code. Ann. § 48-601 *et seq.*;

n.      the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq.*;

o.      the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2 *et seq.*;

p.      the Iowa Consumer Fraud Act, Iowa Code § 714.16 *et seq.*

q.      the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623 *et seq.*;

r.      the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110 *et seq.*;

s.      the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401 *et seq.*;

- 138 -

t.      the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5, § 207 *et seq.*;

u.      the Maryland Consumer Protection Act, Md. Code Ann. Com. Law, § 13-301 *et seq.*;

v.      the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen Laws Ann. Ch. 93A *et seq.*;

w.      the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901 *et seq.*;

x.      the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F *et seq.*;

y.      the Mississippi Consumer Protection Act (Miss. Code. Ann. § 75-24-1 *et seq.*;

z.      the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101 *et seq.*;

aa.     the Nebraska Consumer Protection Act, Neb. Rev. St. § 59-1601 *et seq.*;

bb.     the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 41.600 *et seq.*;

cc.     the New Hampshire Regulation of Business Practices For Consumer Protection, N.H. Rev. Stat. § 358-A:1 *et seq.*;

dd.     the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8 *et seq.*;

ee.     the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 *et seq.*;

ff.     the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349 *et seq.*;

gg.     the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1 *et seq.*;

- 139 -

hh.    the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15 *et seq.*;

ii.    the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 *et seq.*;

jj.    the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15 § 751 *et seq.*;

kk.    the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605 *et seq.*;

ll.    the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*;

mm.    the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-5.2(B) *et seq.*;

nn.    the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.*;

oo.    the South Dakota Deceptive Trade Practices and Consumer Protection, S.D. Codified Laws § 37-24-1 *et seq.*;

pp.    the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*;

qq.    the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Code Ann., Bus. & Con. § 17.41 *et seq.*;

rr.    the Utah Consumer Sales Practices Act, Utah Code. Ann. § 13-11-175 *et seq.*;

ss.    the Vermont Consumer Fraud Act, 9 V.S.A. § 2451 *et seq.*;

tt.    the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199 *et seq.*;

uu.    the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010 *et seq.*;

vv.    the West Virginia Consumer Credit And Protection Act, W. Va. Code § 46A *et seq.*;

- 140 -

ww.   the Wisconsin Deceptive Trade Practices Act, Wis. Stat. §
100.18 *et seq.*; and

xx.   the Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-
12-101 *et seq.*

347.   The unfair and deceptive practices engaged in by FCA described above, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

348.   FCA's acts and practices were unfair and created a likelihood of confusion or misunderstanding and misled, deceived, or damaged Plaintiffs and members of the class in connection with the manufacture, marketing, and sale of Class Vehicles without disclosure of either the Oil Consumption or Oil Indicator defects. FCA's conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services, whether or not a person has in fact been misled, deceived, or damaged in violation of each of the above-enumerated statutes.

349.   Plaintiffs, on behalf of themselves and class members, seek restitution, monetary damages, treble damages, and such other and further relief as set forth in each of the above-enumerated statutes.

- 141 -

## COUNT VIII

## FRAUDULENT CONCEALMENT UNDER COMMON LAW OF EACH STATE

350.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

351.   This Count is brought by Plaintiffs, individually and on behalf of all similarly situated residents of each of the 50 states for breach of the common law of fraudulent concealment in each state.

352.   FCA intentionally misrepresented and concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiffs and class members information that is highly relevant to their purchasing decision.

353.   The vehicles Plaintiffs and class members purchased or leased were, in fact, defective, unsafe and unreliable, because they were subject to stalling or shutting down even while the vehicle was in operation, at normal driving speeds.

354.   FCA had a duty to disclose this material safety information to Plaintiffs and members of the class because of the safety hazards posed by the alleged defects and based on its representations to the contrary.

355.   FCA's concealment was material because if it had been disclosed, Plaintiffs and class members would not have bought or leased the Class Vehicles or paid as much for them.

- 142 -

356.   FCA intentionally engaged in deception in order to sell the Class Vehicles.

357.   Plaintiffs and class members relied on FCA's reputation as an automaker—along with FCA's omission of the defects in the Class Vehicles and FCA's affirmative assurance that its vehicles were safe and reliable and other similar false statements—when they purchased or leased the Class Vehicles.

358.   As a result of their reliance, Plaintiffs and class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of the Class Vehicles.

359.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and class members. Plaintiffs are therefore entitled to an award of punitive damages.

### RELIEF REQUESTED

Plaintiffs and class members request that the Court enter an order or judgment against Defendant including:

A.   Certification of the action as a Class Action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.   Actual damages, statutory damages, punitive or treble damages, and

such other relief as provided by the statutes cited;

C.      Pre-judgment and post-judgment interest on such monetary relief;

D.      Other appropriate injunctive relief as permitted by law or equity;

E.      The costs of bringing suit, including reasonable attorney's fees; and

F.      All other relief to which Plaintiffs and members of the class may be

entitled by law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

DATED: May 18, 2020           Respectfully submitted,

By: /s/ Steve W. Berman
Steve W. Berman
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150
elaine@hbsslaw.com

E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
Miller Building
950 West University Drive, Suite 300
Rochester, MI 48307
(248) 841-2200
epm@miller.law

- 144 -

Jeffrey S. Goldenberg
Todd Naylor
**GOLDENBERG SCHNEIDER, LPA**
One West 4th Street, 18th Floor
Cincinnati, OH 45202
(513) 345-8291
jgoldenberg@gs-legal.com
tnaylor@gs-legal.com

*Attorneys for Plaintiffs*

- 145 -